745 So.2d 166 (1999)
STATE of Louisiana
v.
Salvador PEREZ.
No. 98-KA-1407.
Court of Appeal of Louisiana, Fourth Circuit.
November 3, 1999.
*168 Harry F. Connick, District Attorney, Val M. Solino, Assistant District Attorney, New Orleans, Louisiana, Attorneys for the State of Louisiana.
Sherry Watters, Louisiana Appellate Project, New Orleans, Louisiana, Attorney for Salvador Perez.
*169 Court composed of Judge WILLIAM H. BYRNES, III, Judge CHARLES R. JONES, and Judge DENNIS R. BAGNERIS, Sr.
JONES, Judge.
Defendant Salvador Perez (Perez) appeals his conviction of first degree murder, and sentence of life imprisonment. Finding no error by the trial court, we affirm the judgment.

PROCEDURAL HISTORY
Perez was charged by grand jury indictment on September 12, 1996, with first degree murder, a violation of La. R.S. 14:30. Following a lunacy hearing on January 30, 1997, defendant was found competent to proceed.[1] On March 7, 1997, the trial court denied defendant's motion to suppress the evidence. On April 4, 1997, defendant withdrew "any former plea of not guilty" and entered a plea of not guilty by reason of insanity.
Following three additional lunacy hearings, the trial court found Perez dangerous to himself and others and remanded defendant to the Feliciana Forensic Facility. On December 16, 1997, Perez was transferred to Orleans Parish Prison to await trial. Following trial before a twelve-person jury on March 11-14, 1998, he was found guilty as charged. The jury unanimously recommended life imprisonment in the penalty phase. On March 27, 1998, the trial court denied Perez's motions for post-verdict judgment of acquittal and for a new trial. He waived legal delays and was sentenced to life imprisonment at hard labor, without benefit of parole, probation, or suspension of sentence. A notice of appeal was filed on the date of sentencing.[2]
The record was then lodged in this Court on June 8, 1998. The record was supplemented in July 1998 with a transcript of the April 17, 1997 lunacy hearing.[3] The transcripts from the additional lunacy hearings were later supplemented into the record of the Court.

FACTS
At trial, Byron White, a supervisor of security at the New Orleans Fair Grounds race track, testified that on July 17, 1996, at around 10:00 a.m., his office received a suspicious call from a nearby resident. The caller stated that he saw a man and a little boy were near barn twenty-six with a gun. Officer White testified that he traveled down Leda Court (street) ran right into barn twenty-six. When Officer White, who was in uniform, approached that location in his golf cart, he encountered Perez, who drew out a small black handgun and held it by his side. Perez pulled the boy in front of him, and told Officer White to leave them alone because no one was going to take his kid. Officer White then retreated and called the police. At trial, Officer White identified Perez as the person he encountered that day, and identified a gun in evidence as resembling the one Perez had that day. Officer White confirmed that Perez, who was Spanish, spoke perfect English on that day.
Arden Taylor, a New Orleans Police Lieutenant, testified that he was assigned to the Fair Grounds on July 17, 1996. He testified that arrived at the racetrack approximately 6:30 p.m., and learned that a twelve-year old boy had been abandoned near the racetrack and was in the security office. Further investigation revealed that this boy had been with his father, who had confronted Officer White earlier in the *170 day. The boy, Salvador Perez Jr., informed the officer that he and his father had come from Texas in a van that was parked nearby. Lieutenant Taylor testified that the boy told him that his father had "ripped off" some drugs dealers, and that his father believed he was being followed by gangs from Texas. Lt. Taylor called for a canine unit because the boy indicated that narcotics were involved. Though narcotics were not found, the van was impounded pending further investigation.
Debbie Mastio testified that on July 17, 1996, she was living in the top half of a duplex located at 1437 Leda Court. She testified that she arrived home that evening at approximately 10:30 p.m., and noticed that her hot water was not running. Dr. Elliot Black, a friend interested in purchasing a photograph she had taken, arrived shortly before 11:00 p.m. While Dr. Black was there, Ms. Mastio went to check on her hot water heater, located downstairs from her second-story apartment. She testified that she went halfway down the back stairs, leaned over, and shined a flashlight down toward the door of the utility room housing the water heater. As she shined the light around the utility room, Ms. Mastio testified that she saw a man, who suddenly pulled his hands up and pointed a long, cylindrical, shiny, metallic object at her. She ran back inside and tried to call her downstairs neighbor, but got no answer. She testified that Dr. Black went outside with the flashlight, only to return in a few seconds, locking the door behind him. Ms. Mastio then reported the incident to the police. She telephone the police again after fifteen minutes had passed. When the police arrived, they walked through her apartment to the back door. Ms. Mastio said Officer Chris McCormick walked down the stairs. She remained inside. After a few seconds, she heard a pop. The other officer radioed for help, and backup officers arrived. She testified that the man she had seen that night could have been Perez, but that the person seemed thinner, and had dark and wet or oily hair, pulled back. She also testified that she did not remember such a bulky moustache. Ms. Mastio identified a number of photographs, which depicted the scene as it appeared that night.
Dr. Elliot Black's testimony generally tracked that of Ms. Mastio. He testified that when he went down the rear stairs to check out the situation, he saw a man down there pointing a gun at him. After police arrived and Officer McCormick went down the back stairs, Dr. Black heard a pop. He testified that the officer fell at the bottom of the stairs.
Artie Jackson, a New Orleans Police Officer, testified that he and Officer McCormick were working the night shift on July 17, 1996. As he and Officer McCormick were leaving from roll call, they received a call on Leda Court. Officer Jackson testified they arrived at the Leda Court address neither their lights nor their siren were on. Officer McCormick then went down the rear stairs after speaking with Ms. Mastio. Officer McCormick was subsequently shot on the last step, and he fell backwards, clutching his chest. Officer Jackson then radioed for backup. He testified that certain areas of the yard were very dark.
New Orleans Police Sergeant Andrew Washington testified that he responded to a "signal 108" or officer in danger radio call on the night of July 17, 1996 at the Leda Court address. He said that after the shooting officers recovered a live .25 caliber round in the utility shed and one spent shell casing. Sgt. Washington said four canine units came out. The police officers searched the areas around six or seven homes to the right of Ms. Mastio's residence, and then proceeded to search homes to the left. Officer Chambliss's dog alerted to a person possibly underneath 1429 Leda Court, the residence immediately to the left of Ms. Mastio's. Officer Chambliss ordered his dog under the house, and two shots rang out. His dog gave out a yelp and came back out. Officer *171 Chambliss sent the dog under again, assumed a prone position on the ground, and ordered Perez to come out. Officer Chambliss then fired two shots, striking Perez twice and disabling him. Other officers retrieved Perez and recovered the .25 caliber weapon, live rounds, and two cartridge casings. Sgt. Washington identified the gun recovered and numerous photographs depicting the scene as it appeared that night, including photographs of Officer McCormick's flashlight, radio, and asp on the ground where he fell after being shot. Sgt. Washington testified that Ms. Mastio positively identified Perez as the person she had observed in her utility shed shortly after the officers arrested Perez.
Officer Raymond Veit testified that he responded to the call on Leda Court on July 17, 1996. He testified that he was in a position to see an individual fighting with the police dog underneath the house. Officer Veit testified that Officer Chambliss told him during this time that Perez just shot his dog. He testified the police were all giving Perez verbal commands in English to stop resisting, which he eventually did. Officer Veit testified the officers got the police dog out, and he went under the house and dragged out the limp Perez.
Dr. Myron Smith, a doctor of veterinary medicine, testified that he examined the canine dog, Max, on July 19, 1996, at an animal emergency clinic in Jefferson Parish. Dr. Smith x-rayed Max and removed a bullet, which he turned over to Officer Hosley.
Detective William B. Williams Jr. testified that on October 4, 1996, he went to the New Orleans Police Department auto pound and took photographs of a 1991 Ford van with Texas license plates which was involved in this case. Det. Williams identified these photographs at trial. Det. Williams also recovered evidence from the vehicle, which included two 3×5 inch memo pads; a note pad; a "Berger Field tool rental;" a road map of the United States; a receipt for $450.00; a pair of binoculars; a Wal-Mart receipt dated July 13, 1996 from Seguin, Texas; and an ice chest containing what appeared to be a lot of decayed food.
William Newman, a pathologist at the Louisiana State University School of Medicine, was qualified as an expert in pathology. Dr. Newman testified that he performed the autopsy on Officer McCormick. Dr. Newman testified that the cause of Officer McCormick's death was a single gunshot wound to the chest that pierced his heart, left lung, and rib cage, coming to rest under the skin beneath the officer's shoulder blade. Dr. Newman identified the bullet he recovered from Officer McCormick's body. On cross-examination, Dr. Newman identified a report from the Medical Center of Louisiana at New Orleans, which showed that Perez tested negative for the presence of drugs and alcohol on July 22, 1996.
Officer Kenneth Leary Jr., a firearms examiner with the police department's crime laboratory, identified a Lorcin model L25 .25 caliber semi-automatic pistol, serial number 049448, recovered from the crime scene, and two .25 caliber cartridge cases. One of the cartridges were recovered from 1437 Leda Court, and the other from 1429 Leda Court. Officer Leary stated that both of these .25 cartridge cases matched the firing pin impression and breech face markings made by the Lorcin pistol. Officer Leary also testified that the striation markings on the bullet recovered from the body of Officer McCormick matched those of a bullet test fired from the Lorcin pistol. Officer Leary testified the Lorcin pistol was used to kill Officer McCormick. Officer Leary found that a 9mm cartridge case and the spent 9mm bullet recovered from 1429 Leda Court had both been fired by Officer Chambliss's 9mm duty weapon. Officer Leary determined that a spent 9mm bullet recovered from Perez matched the 9mm test bullet fired from Officer Chambliss's duty weapon. Finally, Officer Leary stated that a .25 caliber spent bullet recovered from Max the police dog was positively *172 matched to the Lorcin pistol. Officer Leary further testified that he could not get the pistol to fire semi-automatically, but had manually retract the slide and use his finger to guide the next bullet from the magazine into the chamber.
Danine McCormick testified that she had been married to Officer Chris McCormick for five years at the time he was murdered.
Dr. Kenneth Ritter was qualified by stipulation as an expert in the field of forensic psychiatry. Dr. Ritter interviewed Perez on December 18, 1997, in the company of Dr. Raphael Salcedo, whose first language is Spanish and who translated for Dr. Ritter. Dr. Ritter, who was appointed by the trial court to determine Perez's competency to proceed, concluded that Perez was competent to proceed.[4] However, Dr. Ritter diagnosed Perez as a chronic paranoid schizophrenic, finding that he had all the signs and symptomsdelusions, hallucinations, and disorganized thinking. Dr. Ritter testified that it was his opinion that Perez did not understand the difference between right and wrong when he shot Officer Chris McCormick on July 17, 1996. He based his opinion on the fact that Perez had been under the delusion that people were out to kill him, and that he fled from his home in Seguin, Texas to avoid these people. Perez took evasive maneuvers such as sleeping in a Texas park rather than in a motel. He took country roads rather than regular highways. Perez's wife and son said Perez had been suffering from this delusional condition for at least two weeks prior to the murder.
There was information that Perez took his son because he felt that he could trust him, and that he did not trust his wife because he thought that she might be involved. Dr. Ritter testified that Perez was acting delusional when he grabbed his son when he was approached by the security guard at the Fair Grounds, indicating that he was afraid that the security guard would try to take his son. Dr. Ritter testified that when Perez became separated from his son later that day, he believed that someone had kidnapped his son, which could have reinforced his delusional thinking. However, Dr. Ritter did not believe that Perez was malingering.
On cross-examination, Dr. Ritter again testified that he only met with Perez once. Dr. Ritter said that at the time he examined Perez he was in "decent remission" and not having delusions, but did have some signs of disorganized thinking. He said he met with Perez's wife and son only a few weeks prior to trial, on February 3, 1998. He said they spoke English very well. He found them to be simple and unsophisticated, and said they responded to his questions directly, without any attempt to evade or embellish anything. They told Dr. Ritter that for some weeks prior to the shooting of Officer McCormick Perez felt threatened by his in-laws and their drug-dealing neighbors. Perez would whisper so low that at times no one could hear him. He saw cars passing back and forth and would think the cars were occupied by his tormentors. Perez's son stated that he and Perez avoided stops for food or drink while traveling to New Orleans. Once, when they did stop at a convenience store and the son went inside, Perez became so concerned that something was going to happen to his son that he blew the horn to get the son to come back to the car, and they left. Dr. Ritter claimed that Perez's son said Perez would push buttons in the van for some sort of "magical reason," thinking that this would in some way throw the people who were following them off the track.
Dr. Ritter testified that it would not make any difference in his opinion if Perez *173 had packed an ice chest with food for the trip, had purchased maps, and had stopped at Wal-Mart. Dr. Ritter admitted that he had not examined Perez in a delusional state, stating that Perez had been released from the Feliciana Forensic Facility after responding to medication, which, he said, was a classic situation seen in paranoid schizophrenia. Dr. Ritter admitted that he did not objectively corroborate anything, and that his conclusions were essentially based on the stories of his wife and Perez's adolescent son.
Dr. Raphael Salcedo was qualified by stipulation as a forensic psychologist. He first examined Perez on October 8, 1996. He testified Perez claimed he did not know his date of birth, leading the doctor to conclude that Perez was malingering. Dr. Salcedo was later informed by defense counsel that Perez was behaving oddly. Therefore, Dr. Salcedo evaluated defendant again on May 6, 1997. On this examination Perez was verbalizing and sounded psychotic. Perez said people from Texas were following him; and his thought processes seemed more disorganized. Dr. Salcedo testified at that time he started to have some doubts about the issue of malingering. He recommended that Perez be committed to the Feliciana Forensic Facility (the "FFF"). It was determined by the staff at FFF that Perez was extremely paranoid and had a serious mental illness, and that he was not competent to proceed. Dr. Salcedo testified Perez was treated with an anti-psychotic medication at the hospital. When he and Dr. Ritter examined Perez in December 1997, Perez was found to be displaying some psychotic symptoms, but they were in fairly good remission. Therefore, he and Dr. Ritter found Perez competent to proceed.
Dr. Salcedo testified he and Dr. Ritter then interviewed Perez's wife and thirteen year-old son in an effort to determine whether Perez was sane at the time of the offense. Dr. Salcedo's testimony in this regard generally tracked that of Dr. Ritter. He did add that Perez's wife related that Perez had no history of psychiatric problems or treatment. Dr. Salcedo testified he learned from some unknown source that Perez's father had displayed a similar pattern of late onset psychosis. Dr. Salcedo testified it is unusual for someone Perez's age to develop a psychotic disorder, that most are seen in people in their early to mid-twenties. Dr. Salcedo testified that it was not too difficult to detect malingerers; most people do not know the constellation of symptoms justifying a diagnosis of psychosis. He testified that, based on Perez's educational background and his work experience, he did not think Perez could develop such a classic response to the medication prescribed to him at the FFF-which takes time to begin working in the brain-and also to the onset of the symptoms. Dr. Salcedo testified that is was his opinion that Perez's condition had progressed during the trip to New Orleans and that, with the disappearance of his son, he was so actively psychotic that he was unable to distinguish right from wrong at the time of the offense, and in fact believed he was acting in self-defense.
On cross-examination, Dr. Salcedo explained that he first found Perez competent to proceed because Perez was simply answering that he did not know the answers to all of the questions, and that he therefore suspected Perez of possible malingering as to his memory. However, Dr. Salcedo read his report dated May 6, 1997, wherein he stated: "Mr. Perez presented as previously; i.e., as an individual who is at the very least grossly exaggerating any psychopathology which might actually be present." Dr. Salcedo agreed that a person can become educated to giving an answer to put him in a psychotic light, but said "I'm not convinced that that's the case here." On redirect examination, Dr. Salcedo testified that he did his doctoral dissertation on malingering, and said that it is one of the first things he feels the need to rule out in cases like Perez.
Dr. Jose Pena, qualified by stipulation as an expert in the field of clinical psychiatry, *174 interviewed Perez in December 1997, while Perez was in the FFF, to determine Perez's competency to proceed. Dr. Pena interviewed Perez again on March 8, 1998, days before trial, as to Perez's mental state at the time of offense. It was Dr. Pena's opinion that Perez was suffering from a psychotic disturbance at the time of the offense. Dr. Pena based his determination on his interview with Perez, his wife and son, and for the same reasons as Drs. Ritter and Salcedo. He added that Perez's wife related that Perez was paranoid even in situations where supposedly no one else was around, such as when they were in a car alone. The son said Perez believed his wife and mother might be involved in the plot. Dr. Pena testified these symptoms described by Perez's wife and son were very similar to the symptoms found on examination by physicians at the FFF-a psychotic thinking disturbance that included prominent symptoms of paranoia and persecution. Dr. Pena testified that Perez did not present as a malingerer, nor did he believe Perez's wife and son were being untruthful. In these areas, again, his testimony generally tracked that of Drs. Ritter and Salcedo. It was Dr. Pena's opinion that at the time Perez shot Officer McCormick he was not able to distinguish right from wrong because of the severe psychotic mental disturbance.
On cross-examination, Dr. Pena admitted that he had only interviewed Perez's wife and son over the telephone, on March 8, 1998, a few days prior to his testifying. However, he testified he did not believe this type of interview affected his findings. When asked whether it was possible that Perez simply shot the officer because he did not want to go jail, Dr. Pena testified he could imagine that.
Dr. Guillermo Urrutia, who was qualified by stipulation as an expert in clinical psychiatry, testified that it was his impression that Perez had a delusional disorder of a persecutory type, which, he testified, usually is a disorder that happens in middle or late middle life. Dr. Urrutia interviewed Perez nine months after the crime. He did not think Perez was malingering. Dr. Urrutia went into detail about the things Perez would say, and that he was uncooperative. Perez accused Dr. Urrutia of being an investigator, not a doctor, and said he would not talk to him until his wife got there. Perez said he was driving down I-10 and people were following him and he had to press buttons on the dashboard of the van to deceive them. Dr. Urrutia testified Perez was very confused on the subject of the shooting, which the doctor found consistent with someone who had been in a very panicked state. It was his opinion that Perez did know right from wrong when he shot Officer McCormick. He testified Perez was in a state of panic and was totally psychotic, insane.
On cross-examination, Dr. Urrutia said he did not believe Perez was schizophrenic, but felt there was room for a difference of opinion. He testified Perez would answer a question with a question, indicating that he was very suspicious and did not want to commit to an answer. Dr. Urrutia testified Perez never told him that he shot a police officer, but said he saw somebody coming in the dark who he felt had taken away his son, and he shot at a shadow. He testified Perez told him that he shot the dog because the dog was biting him and dragging him from underneath the house. However, Dr. Urrutia testified he could never pin Perez down to tell him exactly what happened because, the doctor felt, Perez did not remember. Dr. Urrutia admitted that Perez was not experiencing hallucinations.
The court, the jury, and the attorneys for both sides visited the scene of the crime on Leda Court, without Perez, who waived his presence.
Dr. David Carrington, who was qualified by stipulation as an expert in the field of forensic psychiatry, was a psychiatrist employed at the Feliciana Forensic Facility. After Perez was sent to the FFF on August 9, 1997, Dr. Carrington testified it was his job to evaluate him and, if possible, *175 treat him and restore him to competency so that he could stand trial. Dr. Carrington testified that he did not examine Perez with regard to his sanity at the time of the offense. On his initial examination, Dr. Carrington found Perez's thought processes quite disorganized. He had a great deal of difficulty relating past events, his history, and had "flight of ideas," jumping from one subject to another, which, Dr. Carrington testified, was not an uncommon finding in someone who has a significant degree of mental illness. Perez related that he previously had been hearing sounds of machinery and music. One week later, Perez's thinking continued to be disorganized, and he continued to hear music and machinery. Perez also said he could communicate with his wife; he could hear her voice in his head. Generally, Perez was observed on the ward to keep to himself-he was the only Spanish-speaking individual on the ward at first. He minded his own business and was able to get along with the ward routine, i.e., eat his meals, take his shower, etc. Because of his thinking and hallucinations, Dr. Carrington prescribed the anti-psychotic medication Haldol. The doctor learned from Perez that he had a third-grade education; and to the doctor's knowledge, illiterate in both English and Spanish. Dr. Carrington testified he did not believe Perez was malingering, something he testified they are acutely aware of at the FFF. Dr. Carrington increased the Haldol dosage after Perez had been at the FFF for three weeks, and as of the fourth week, Perez was free from any hallucinations or disorganization of his thinking.
On cross-examination, Dr. Carrington admitted that Perez's circumstances during his thirteen-months of incarceration after his arrest but before his move to the FFF could have contributed to the condition he was in when first seen at the FFF. He testified while that Perez was at the FFF he never acted in an aggressive manner, caused a disturbance, or got into a fight on the unit, but noted that this was completely different from whether or not he posed a potential danger if released to the community.
Dr. Sarah Deland, qualified by stipulation as an expert in the field of forensic psychiatry, testified that she was appointed by the court to a sanity commission along with Dr. Salcedo. It was her opinion that Perez had a significant mental illness, a psychotic disorder similar to schizophrenia. Dr. Deland was unsure of the actual definitive diagnosis because, she said, several mental disorders have similar symptoms. Dr. Deland admitted that after her first examination of Perez she and Dr. Salcedo pronounced him competent to proceed, and in fact, she found that he was not suffering from any mental illness. However, she testified, as had Dr. Salcedo, that Perez did not really talk a whole lot during that examination, which she said was conducted with an attorney present, another person with the public defender's office, and a court reporter taking down everything that was said. She testified that in such a case a paranoid person suffering from feelings of persecution might not be forthcoming. Dr. Deland testified that in a forensic setting, malingering is always an issue to be considered, but that she did not believe Perez was malingering. She testified he presented a classic case of a person suffering delusions of being pursued, persecuted, and threatened. Dr. Deland also testified that the information she received from Perez's wife and son was consistent with the progression of the illness she saw in Perez, and testified they did not strike her as persons attempting to manufacture anything. She testified she did not believe Perez knew right from wrong on July 17, 1996 when he shot Officer Chris McCormick.
Rosa Perez, Perez's wife, testified that she and Perez had been married for fifteen years and had five children. She testified that some two weeks prior to the time he left home on July 17, 1996, he was very quiet. When he was outside or at a store, Perez would look around his surroundings, *176 afraid someone was looking at him or watching him. He would talk low, in a whisper, like he was afraid someone was going to hear him. He would look out of the windows, in an edgy mood. She said he did not write or speak English. On the day he left home, he said he was going to feed their five cows and come right back. Mrs. Perez said that the night before, at approximately 11:00 p.m., dogs had gotten some of their clothes off the clothesline, and he was hesitant to retrieve the clothes, suggesting that they leave them until the next day. She implied that he was afraid to go outside. She finally prevailed on him to retrieve one of her favorite shirts. Mrs. Perez testified she worked at Wal-Mart, and drove to and from work in their van. She identified the two notebooks found in the van, and said they kept an ice chest in the van for when they went out to "the land," presumably where they kept the cows.
On cross-examination, Mrs. Perez testified she did not remember whether the ice chest in the van had any food in it the last time she saw it. She said they had no map in the van. She was asked if she remembered Detective Joey Catalanotto asking her whether her husband had any kind of psychological problems. She first answered in court that she told Det. Catalanotto that she did not remember his having "something this serious before." After being shown what presumably was a transcript of her statement, she testified that she had replied "not that I remember" to the question of whether he had had any psychological problems. She testified that she told a Dr. Kromberger that he had been forgetful. After being shown Dr. Kromberger's report, she testified she told him that she did not remember his acting strangely. On redirect examination, Mrs. Perez testified she told Dr. Kromberger that her husband had been exhibiting different behavior prior to the weeks before he left.
Salvador Perez Jr., the fourteen year-old son, testified that prior to the morning he and his father left Seguin, Texas, his father had not been sleeping much, he had grown more suspicious, and his behavior had been quieter. Salvador Jr. testified that on the way to feed the cows, his father said he was going to drive around so that he could lose the people following him. When they stopped at a convenience store, Salvador Jr. went inside. As he went to check out, his father began honking the horn. He testified his father was afraid and wanted to leave as soon as possible. Salvador Jr. testified that while driving his father was pushing buttons on the roof of the van fast, saying he was acting like he was doing something so that the people who were following them would try and see what he was doing. Salvador Jr. also testified that while on the highway, when his father would see the other cars around him he would speed up a little bit to lose them. Salvador Jr. testified that after he was taken into custody by police, he never told them about his father being involved in drugs or narcotics. He testified he had never seen or heard anything about his father being involved in drugs. However, he did tell police that his mother and father believed that his step-father's friends sold drugs, and that he, Salvador Jr. thought that they had asked his father if he wanted to be involved in the drug business, but that his father turned them down. He further admitted telling police that both his mother and father thought that his father did something which made "the drug buyers" mad, and that his father thought they were after him because he did not want to sell drugs. He also testified that when he talked to his father he always talked to him in Spanish, never in English. He testified that when he talked to the doctors about his father he told them the truth, and was telling the truth at trial.
Detective Joseph Catalanotto testified that when he asked Mrs. Perez in July 1996 whether her husband had any psychological problems, she answered "No, not that I know of." Det. Catalanotto also *177 testified that Salvador Jr. related to him that his father had rejected Salvador's step-grandfather's offer to engage in some type of narcotics business.
Dr. Carlos Kromberger was qualified by stipulation as an expert in clinical psychology. Dr. Kromberger had been awarded a "diplomat" in clinical psychology, granted to approximately four percent of psychologists in the United States. Dr. Kromberger evaluated Perez during several interviews over a period of fourteen hours in April 1997. Dr. Kromberger testified that Perez had IQ scores within the mildly retarded range. However, he testified he saw indications that Perez could function at a higher level; he really had a little bit more understanding than what he was showing on the tests. He testified Perez cooperated but was guarded. Dr. Kromberger did not believe Perez was mentally retarded. Nevertheless, he diagnosed Perez to be suffering from a severe persecutory delusional disorder, although he did not find Perez to be schizophrenic. He testified Perez said he thought people were following him and he was afraid they were going to kill him. He initially thought his wife was in on the plot, and was worried that his son was going to get killed. He told his son that he wanted to go live in Florida, where they had lived until they were wiped out by Hurricane Andrew. Perez told Dr. Kromberger that he shot a dog, and that Perez believed the people approaching him were the ones that had taken away his son. "So he must have been in an acute state of anxiety or fear, very frightened. And when he fired off tragically killing a policeman, he probably didn't have any idea what was going on". Dr. Kromberger testified he did not think Perez knew right from wrong when he killed Officer McCormick. He thought Perez was in an acute psychotic state at the time. He testified he did not know whether or not Perez had a chance to see the officer, "but he certainly didn't know what he was doing." He did not think Perez was malingering.
On cross-examination, Dr. Kromberger speculated that if the van had been towed, Perez probably was on Leda Court looking for some sort of refuge. He admitted the possibility that there were other reasons why Perez did what he did. Dr. Kromberger read a paragraph from his report stating that, according to Mrs. Perez, her husband did not have any serious medical problems; that he had always had memory difficulties; that she did not notice anything different or strange about him before he left home; and that he had telephoned her after he left, and told her that the neighbors were involved with drugs and were trying to kill him. Dr. Kromberger testified Mrs. Perez did not mention that Perez was whispering until he talked to her within one to three months of trial.

ERRORS PATENT
A review of the records reveals two errors patent.[5]
Neither the docket master nor the minute entries show that Perez was ever arraigned or entered an initial plea. However, the minute entry for April 4, 1997 reflects that on that date Perez "WITHDREW ANY FORMER PLEA OF NOT GUILTY" and entered a plea of not guilty by reason of insanity.
"The arraignment consists of the reading of the indictment to the defendant by the clerk in open court, and the court *178 calling upon the defendant to plead." La. C.Cr.P. art. 551(A). However, "[a] failure to arraign the defendant or the fact that he did not plead, is waived if the defendant enters upon the trial without objecting thereto, and it shall be considered as if he had pleaded not guilty." La.C.Cr.P. art. 555; State v. Scott, 97-0028, p. 6 (La.App. 4 Cir. 3/18/98), 709 So.2d 339, 342.
The record does not reflect that Perez made any objections regarding his arraignment or pleas prior to trial. Also, the plea of not guilty by reason of insanity upon which he proceeded to trial was entered by Perez through counsel, in his presence. Therefore, any irregularity in failing to arraign Perez or have him initially enter a plea was waived.

ASSIGNMENT OF ERROR NO. 1
By this assignment of error, Perez argues that the trial court erred in allowing a third-year law student to assist his trial counsel in this capital trial.
La.C.Cr.P. art. 512 provides in pertinent part that:
Counsel assigned in a capital case must have been admitted to the bar for at least five years. An attorney with less experience may be assigned as assistant counsel.
Perez also cites La. R.S. 15:150(B)(C)(2), which provides for the establishment of regional death penalty centers, and states that "[n]o attorney with less than five years criminal trial practice shall serve as lead counsel in any death penalty case assigned to the regional death penalty center."
It is not disputed that Robert Jenkins, the attorney who represented Perez, was qualified to represent him under the five-year requirement of La.C.Cr.P. art. 512, and, assuming the statute is applicable, La. R.S. 15:150(C)(2). However, Andrew Michaelson, a third-year law student at Loyola University Law School, actively participated in Perez's trial, presumably pursuant to Louisiana Supreme Court Rule XX, providing for the participation of law students in trial work. Rule XX, § 3(c) (as amended November 21, 1988) allowed law student participation in any criminal matter in which the defendant had the right of assignment of counsel.[6]
Perez executed a waiver authorizing Mr. Michaelson to represent him under the direct supervision of his attorney, Robert Jenkins. Rule XX, § 3 specifically requires such a waiver. He attacks that waiver, arguing that he was illiterate and had pleaded not guilty by reason of insanity. However, the failure to obtain such written waiver or to adhere to other procedural requirements of Rule XX is not a violation of a statutory or constitutional right. State v. Edwards, 351 So.2d 500, 504 (La.1977). The failure to comply with the requirements of Rule XX might, in a given case, amount to reversible error if prejudicial to the substantial rights of the accused. Id., citing La.C.Cr.P. art. 921. In the instant case, as in Edwards, Perez cites no prejudice to him due to any defect in obtaining the waiver, or due to any failure by Mr. Michaelson to comply with other requirements of Rule XX, nor does the record reflect any such prejudice.
But the primary thrust of Perez's argument is that Mr. Michaelson was simply not qualified to represent him in this *179 capital case because he was not an attorney. It is well-settled that a defendant is considered to have been represented by counsel where he is represented by a student practitioner and a qualified attorney. See Edwards, 351 So.2d at 504. In the instant case, Perez's attorney, Mr. Jenkins, cross-examined-or declined to cross-examine-twelve of the fifteen witnesses presented by the State; argued one motion and made a number of objections throughout the trial; and made the closing argument. Mr. Michaelson made the opening statement; argued two motions during the trial; cross-examined two State witnesses, declining to cross examine another; and questioned five medical experts on direct examination.
Mr. Jenkins was a qualified attorney in the case, as well as Mr. Michaelson's supervising attorney. Mr. Michaelson was a student practitioner functioning just as he could have in a non-capital case-pursuant to Louisiana Supreme Court Rule XX. He was under the direct supervision of Mr. Jenkins at all times. Rule XX contains no exclusion barring student practitioners from making appearances on behalf of defendants charged with capital offenses. Further, under the umbrella of Rule XXXI, by order dated February 1, 1995, the Louisiana Supreme Court authorized the promulgation and implementation of standards relating to counsel appointed to represent indigents accused of capital crimes. Chapter 7 of the Louisiana Standards on Indigent Defense provides in pertinent part that trial lead counsel have five years experience and trial associate counsel have three years experience. Consistent with Rule XX, nothing in the standards set forth in Chapter 7 bars the Rule XX participation of student practitioners in capital cases.[7] Rule XXXI was repealed in December 1997 and a new rule reenacted effective January 1, 1998. Rule XXXI(A)(1) now provides that an indigent defendant in a capital case shall have appointed to represent him "no less than two attorneys ..., lead counsel ... and ... associate counsel ...." But, again, nothing in the new Rule XXXI bars Rule XX student practitioners from participating in capital cases.[8]
La.C.Cr.P. art. 512 does not exclude student practitioners from making appearances on behalf of defendants charged with capital offenses. Perez implies that art 512 does because the statute only refers to assignment of "counsel" admitted to the bar for at least five years, and to assignment of an "attorney" with less experience as assistant counsel. Accepting this interpretation of La.C.Cr.P. art. 512 is analogous to reading La.C.Cr.P. art. 513, providing for assignment of counsel in non-capital cases, also as excluding participation of student practitioners because it refers to assignment of "counsel." There is no merit to this interpretation of La. C.Cr.P. art. 512.
In State v. Brooks, 94-2438 (La.12/19/94), 647 So.2d 339, rehearing granted on other grounds, 94-2438 (La. 3/24/95), 651 so.2d 300, the defendant was convicted of first degree murder and sentenced to death. The trial court subsequently vacated defendant's death sentence because the penalty phase of the trial had been conducted by an assistant to the lead counsel. The assistant attorney had been practicing law for less than five years. In a per curiam decision, the court reversed the trial court on the ground that the defendant had been represented by *180 lead counsel who met the experience requirements of La.C.Cr.P. art. 512. Thus, La.C.Cr.P. art. 512 is intended to ensure that a defendant in a capital case is represented by counsel with at least five years experience. As in Brooks, defendant in the instant case was represented by counsel with at least five years experience.
Moreover, Perez has cited no prejudice to him as a result of Mr. Michaelson participating in his trial. He points to no deficiency in Mr. Michaelson's performance, and the record reflects none. To the contrary, the record reflects that Mr. Michaelson's performance was exemplary. Finally, Perez was not sentenced to death. The sentence imposed on defendant for his first degree murder conviction, life imprisonment at hard labor without benefit of parole, probation or suspension of sentence, is the same sentence he would have received had he been tried for and convicted of second degree murder, a non-capital offense. As a practical matter, he is in the same position he would be in had he been charged with, tried for, and convicted of second degree murder.
There is no merit to this assignment of error.

ASSIGNMENT OF ERROR NO. 2
By this assignment of error, Perez argues that the trial court erred in allowing the State to introduce evidence of other crimes committed by him, specifically, the testimony of Fair Grounds security officer Byron Polite concerning the earlier encounter between himself and Perez on the day of the murder.
This assignment of error is grounded in the rule that evidence of other crimes committed by a defendant is generally inadmissible because of the risk of prejudice from evidence concerning unrelated acts of misconduct. State v. Prieur, 277 So.2d 126, 128 (La.1973); State v. Evans, 99-0211, p. 5 (La.App.4 Cir.6/2/99), 737 So.2d 921, 922.
In the instant case, the State filed a Prieur notice, informing Perez of its intent to present the testimony of Officer Polite. On March 7, 1997, at a motion hearing, the State announced it was ready to go forward on the second part of its Prieur motion, and the following colloquy was had:
BY MR. SALINO [for the State]:
... The second part of the Prieur motion involves a confrontation Mr. Perez had earlier in the day, the same day of this incident, at another location near the Fairgrounds involving the Fairgrounds security officer. That officer is also here to testify. And we'll present that and the Court can rule on whether or not that comes in.
BY THE COURT:
Mr. Jenkins?
BY MR. JENKINS:
Judge, as to that particular incident, we have no objection to that. But we'd like to get the officer's testimony I think he was a security guard as to the events that took place.
BY THE COURT:
Without objection, we'll allow it.
Fair Grounds security officer Byron Polite testified at the hearing. The trial court then ruled on both prongs of the State's Prieur motion. The following colloquy transpired:
BY THE COURT:
I mean at trial if you all call Lieutenant Polite, I'm going to allow him to testify. But you know, had the defendant objected on the record prior to his coming here on this 10 a.m. thing, I wouldn't have allowed it. But you didn't object to it, so I allowed it in.
BY MR. JENKINS:
It goes to our defense, Your Honor, so we don't object.
BY THE COURT:

*181 Well, I figured that maybe you're trying to get some discovery on some things that might be useful to you, but under ordinary circumstances, had you objected, I would not have allowed that. But I will now.
BY MR. JENKINS:
That's fine, Your Honor.
BY MR. JENKINS [SIC]:
So, Judge, my understanding is that we will be allowed to call Officer Polite if we choose?
BY THE COURT:
Absolutely.
BY MR. SALINO:
Thank you, Judge.
Security officer Polite testified at trial without objection by Perez. Because he failed to object to the testimony of security officer Polite and, in fact, concurred with the State's intention to call the witness to testify about his encounter with Perez, he is precluded from raising this issue as an assignment of error. See La.C.Cr.P. art. 841.
There is no merit to this assignment of error.

ASSIGNMENT OF ERROR NO. 3
By this assignment of error, Perez argues that the evidence was insufficient to find that he was able to distinguish between right and wrong at the time of the offense.
The Louisiana Supreme Court was faced with the issue of insanity at the time of the offense in State v. Silman, 95-0154 (La.11/27/95), 663 So.2d 27, and set forth the applicable law as follows:
In Louisiana, a legal presumption exists that a defendant is sane at the time of the offenses. La.R.S. 15:432. To rebut the presumption of sanity and avoid criminal responsibility, defendant has the burden of proving the affirmative defense of insanity by a preponderance of the evidence. La.C.Cr.P. art. 652. Criminal responsibility is not negated by the mere existence of a mental disease or defect. To be exempted of criminal responsibility, defendant must show he suffered a mental disease or mental defect which prevented him from distinguishing between right and wrong with reference to the conduct in question. La.R.S. 14:14; State v. Williams, 346 So.2d 181 (La.1977). The determination of sanity is a factual matter. All the evidence, including expert and lay testimony, along with the defendant's conduct and action, should be reserved for the fact finder to establish whether the defendant has proven by a preponderance of the evidence that he was insane at the time of the offense. State v. Bibb, 626 So.2d 913 (La.App. 5th Cir. 1993), writ denied, 93-3127 (La.9/16/94); 642 So.2d 188; State v. Claibon, 395 So.2d 770 (La.1981). Lay testimony pertaining to defendant's actions, both before and after the crime, may provide the fact finder with a rational basis for rejecting unanimous medical opinion that the defendant was legally insane at the time of the offense. State v. Peters, supra; State v. Claibon, supra.

In reviewing a claim for insufficiency of evidence in an action where an affirmative defense of insanity is raised, this court, applying the standard set forth in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), must determine whether under the facts and circumstances of the case, any rational fact finder, viewing the evidence most favorable to the prosecution, could conclude, beyond a reasonable doubt, that the defendant failed to prove by a preponderance of the evidence that he was insane at the time of the offense. State v. Peters, 94-0283 (La.10/17/94); 643 So.2d 1222; State v. Nealy, 450 So.2d 634 (La.1984); State v. Price, 403 So.2d 660 (La.1981); State v. Claibon, supra; State v. Roy, 395 So.2d 664 (La.1981).
95-0154 at p. 7, 663 So.2d at 32.
In the instant case, all five of the psychiatrists and the one psychologist who examined *182 Perez for insanity at the time of the offense, all of whom testified for Perez, stated that he did not know the difference between right and wrong at the time of the offense.
However, two of those psychiatrists, Drs. Salcedo and Deland, initially diagnosed him on October 8, 1996, less than three months after the crime, as competent to proceed, finding him to be a malingerer because he kept answering that he did not remember when questioned about simple things, such as his date of birth. Dr. Salcedo said Perez had no mental disorder or defect which would render him incompetent to proceed. Dr. Deland wrote the court on February 24, 1997 to state that she and Dr. Salcedo had examined Perez a second time on January 30, 1997, after which she found that he had no symptoms of any mental illness which would affect his competency to proceed. Both doctors later changed their minds. Dr. Salcedo was contacted by defense attorneys who mentioned that Perez was acting oddly. Consequently, Dr. Salcedo said he examined Perez a second time, on May 6, 1997-almost ten months after the crime-at which time Perez was verbalizing and had classic symptoms of psychosis.[9] Dr. Salcedo recommended that Perez be committed to the FFF at that time. Nevertheless, in his report from that May 1997 examination Dr. Salcedo still wrote that Perez "presented as previously; i.e., as an individual who is at the very least grossly exaggerating any psychopathology which might actually be present." Dr. Salcedo testified at trial, however, that he did not believe Perez had been malingering. Dr. Deland also examined Perez a second time, presumably on May 2, 1997, the date of her second report. She changed her mind because, by that second examination, after spending ten months in parish prison, Perez exhibited signs of psychosis.
Both Drs. Salcedo and Deland believed that Perez did not know right from wrong based on what they learned from him, his wife and son.
Dr. Ritter stated that he only examined Perez on one occasion, December 18, 1997-exactly one year and five months after the crime-to determine whether he was competent to proceed. Just as Drs. Salcedo and Deland had found on October 6, 1996 (and, apparently, January 30, 1997), Dr. Ritter found on December 18, 1997 that Perez was competent to proceed, stating that he believed Perez was in a remission on that date. However, on February 3, 1998, Drs. Ritter and Salcedo wrote the court a letter, stating that they had examined Perez for both competency to proceed and sanity at the time of the offense, and both found that, although he was competent to proceed, he did not know right from wrong at the time of the offense. Not coincidentally, February 3, 1998 was the date Dr. Ritter, and presumably Dr. Salcedo also, met with Perez's wife and son. Dr. Ritter found that Perez did not know right from wrong based on what he also learned from Perez, his wife and son.
Dr. Jose Pena interviewed Perez in December 1997 to determine his competency to proceed, and interviewed him again on March 8, 1998, days before trial, for the specific question of Perez's mental state at the time of offense. Dr. Pena also interviewed Perez's wife and son via telephone on March 8, 1998. He also reached his conclusion that Perez did not know right from wrong at the time of the offense based on information given to him by Perez, his wife and son.
Dr. Guillermo Urrutia examined Perez in April 1997, nine months after the crime. In his detailed report Dr. Urrutia recounts the supposedly delusional beliefs of Perez, as told to him by Perez. Dr. Urrutia also interviewed Perez's wife and son, and also *183 concluded that Perez could not tell the difference between right and wrong.
Dr. Carlos Kromberger, the only psychologist to testify, examined Perez in April 1997. He found that Perez suffered from a severe persecutory delusional disorder, and that Perez did not have any idea what was going on when he shot the police officer, or knew the difference between right and wrong.
Dr. Carrington, a psychiatrist at the Feliciana Forensic Facility when Perez was sent there on August 9, 1997, did not examine Perez until that date, over one year after the crime. He gave no opinion as to whether or not Perez was capable of distinguishing right from wrong at the time he shot and killed Officer McCormick. However, he found Perez's thinking to be quite disorganized, consistent with a serious mental illness, and said Perez had hallucinations-he heard music and machinery. Perez's disorganized thinking and hallucinations completely disappeared after four weeks on anti-psychotic medication. Dr. Carrington did not believe Perez was malingering, a problem of which he said he was acutely aware. But he admitted that Perez's thirteen months of incarceration before being moved to the FFF could have contributed to the condition Perez was in upon arrival.
Mrs. Perez's prior statements were inconsistent. She told Dr. Kromberger in April 1997 that her husband had not been acting strangely before the crime, and that defendant had always had memory problems. However, she testified at trial that she also told him that her husband's behavior had been different during this period before the crime. When asked by Det. Catalanotto in July 1996 whether her husband had any psychological problems, she answered not that she remembered. While she testified at trial that before leaving Texas her husband had begun talking in a low whisper, so no one would hear him, she did not report this fact to Dr. Kromberger when she first talked to him, but only within two to three months of trial.
All of the physicians who testified that Perez did not know right from wrong based their opinions, in significant part, on information obtained from Perez's wife and son concerning his behavior prior to the shooting of Officer McCormick.
It is undisputed that Perez's fears stemmed from his belief that persons involved in the drug trade were pursuing him and posed a threat to him and his son. However, his son testified that Perez and his wife both believed that friends of Perez's step-grandfather were involved in drug activity. Perez's son further testified that he believed that his father had spurned a request by these persons to become involved in their drug activities. His son testified both parents believed that Perez had thereby made the "drug buyers" mad, and that Perez consequently believed these people were after him. This is a rational explanation for Perez's paranoid behavior-he was fearful because he had spurned drug dealers and they were after him. His fear for his and his son's safety may well have been justified. As for any possible belief by Perez that his wife may have been involved, there is no evidence that he could not have temporarily had a justifiable suspicion of his wife.
The medical experts all inferred that Perez's fears were delusional and not based in reality, as illustrated by Dr. Pena when he testified: "[W]hat we have here is a picture in which the symptoms began what appears to be one or two weeks before the incident at a time when there was no reason for the person to begin to act disturbed before anything happened." These assumptions that Perez's fears were not based in reality unquestionably formed the basis for the opinions of the medical experts that Perez did not know the difference between right and wrong at the time he shot Officer McCormick. Where those fears were based in reality, as the record indicates they may well have been, then the opinions of those physicians is called *184 into question. Perez's possible very real fears essentially explain his supposed delusional thinking and paranoid behavior.
All of Perez's actions traveling to New Orleans were consistent with a man fleeing rebuffed drug dealers. He traveled back roads. He hurriedly left a convenience store, perhaps thinking anyone pursuing would catch up with he and his son. When he arrived in New Orleans, he decided to get another vehicle. He parked his van and found his way to the Fair Grounds. He and his son were caught trespassing on Fair Grounds property by a security officer. He took a gun out of his pocket, held it at his side, and succeeded in frightening off the officer. Later, separated from his son, he took refuge in Ms. Mastio's utility shed. He was now on the run from not just any drug dealers he may have crossed, but law enforcement authorities as well. When Officer McCormick came upon him, he shot him because he did not want to go to jail-Dr. Pena testified that he could imagine the scenario that Perez simply shot Officer McCormick because he did not want to go to jail.
It is true that, in addition to the supposed delusional thinking, the medical experts found disorganized thinking in Perez, which was consistent with some type of psychosis or serious mental illness. This finding too factored heavily in the experts' opinions that Perez did not know right from wrong at the time of the offense. However, all of the findings of disorganized thinking were made following examinations conducted long after-at least nine months-the shooting of Officer McCormick. Charity Hospital records from the night of the shooting note Perez as being oriented, responsive, and obeying commands. Dr. Carrington admitted that Perez's condition at the time he first examined him at the FFF in August 1997 could have been attributed in some part to his thirteen months of incarceration in Orleans Parish Prison. Two of the physicians, Drs. Ritter and Pena, did not even examine Perez until he had been taking anti-psychotic medication and was no longer experiencing either the supposed delusions or any disorganized thinking. This delay from the time of the offense to noting the disorganized thinking undermines the credibility of the medical experts insofar as their opinions that Perez was insane at the time offense.
On another point, it is important to note that, while anti-psychotic medication first prescribed to Perez at the FFF apparently remedied the disorganized thinking, allowing him to proceed to trial, there was no testimony by any of the medical experts that the now competent Perez and his wife no longer believed that friends of Perez's step-father had been involved with drugs; that defendant had spurned offers by these persons to become involved in the drug trade; or that he had consequently been afraid of harm to him and his son. These factors had been the basis of Perez's fears. These first two factors were facts as stated by Perez's wife and son, not delusions, and the resulting fear on the part of Perez may very well have been justified.
Also, Dr. Ritter stated that Perez's son said that while driving on the highway his father was pressing buttons in the van, thinking that for some "magical reason" this would throw off his pursuers. The son said his father told him he did that in hopes that anyone pursuing him would think he was doing something. Perez was obviously attempting to outwit any pursuers, perhaps making them think that he saw them, by pushing buttons the son said were in an upper console, near the rear view mirror. Perez did not think he would throw off his pursuers for some "magical reason," as stated by Dr. Ritter. Yet, Dr. Ritter based his opinion that Perez was incapable of distinguishing right from wrong, in part, on this nonexistent "magical reason" action by Perez. This undermines Dr. Ritter's credibility. The jury could have considered the opinions of Drs. Deland and Salcedo as undermined because they found Perez free from any mental disease or defect after examining *185 him less than three months after the crime; ten months after the crime found him incompetent to proceed; and then, within a month or so of trial, determined that he had been insane at the time of the offense and unable to distinguish right from wrong.
In conclusion, even assuming Perez was not malingering, the opinions of the medical experts are undermined by their obvious belief that he was suffering from delusions of persecution-crucial to their determinations that he did know the difference between right and wrong at the time of the offense-when the record supports the view that he may very well have been justified in his fears. Their opinions are also undermined by the fact that all of their observations of disorganized thinking in Perez, also crucial to their opinions and diagnoses, were made long after the shooting of Officer McCormick, during which time his condition could have worsened. The opinions of Drs. Ritter, Deland and Salcedo could be viewed as also undermined for the aforementioned reasons.
When reviewing evidence for sufficiency, a reviewing court is not called upon to decide whether it believes the witnesses. State v. Rosiere, 488 So.2d 965, 968 (La.1986); State v. Smith, 600 So.2d 1319, 1324 (La.1992). The determination of credibility is a question of fact within the sound discretion of the trier of fact, and that determination will not be disturbed unless clearly contrary to the evidence. State v. Vessell, 450 So.2d 938, 943 (La.1984); State v. Campbell, 97-0358, p. 11 (La.App. 4 Cir. 5/20/98), 715 So.2d 488, 494, writ denied, 98-2485 (La.2/12/99), 738 So.2d 564.
Considering the facts and circumstances of the instant case, it cannot be said that it would have been clearly contrary to the evidence for the jury to reject the credibility of the medical experts insofar as those experts stated that Perez was incapable of distinguishing right from wrong at the time he shot Officer McCormick. Thus, viewing all of the evidence in a light most favorable to the prosecution, any rational trier of fact could have found that Perez failed to prove by a preponderance of the evidence that he was incapable of distinguishing between right and wrong at the time he shot Officer McCormick.
There is no merit to this assignment of error.

ASSIGNMENT OF ERROR NO. 4
By this assignment of error, Perez contends the trial court erred in instructing the jury on the definition of a necessary element of first degree murder.
After retiring to deliberate, the jury came back with a question regarding whether the offender had to know that he was shooting a police officer. The trial court read the definition of first degree murder, requiring specific intent to kill a peace officer, and told the jury that the statute required that they find that Perez had the specific intent to kill a peace officer. The court told the jury that the statute said nothing about the offender knowing that his victim was a peace officer, and then told the jury that they could "go either way on that." Perez claims the trial court erred in failing to provide the jury with a correct instruction on this alleged necessary element.
A defendant may not assign as error the giving or failure to give a jury charge or any portion thereof unless an objection thereto is made before the jury retires or within such time as the court may reasonably cure the alleged error. La.C.Cr.P. art. 801; State v. Hunter, 92-2535, p. 7 (La.App. 4 Cir. 4/13/95), 654 So.2d 781, 785, writ denied, 95-1217 (La.10/6/95), 661 So.2d 464. A defendant cannot avail himself of an alleged error unless he made a contemporaneous objection at the time of the error. La.C.Cr.P. art. 841(A); State v. Seals, 95-0305, p. 5 (La.11/25/96), 684 So.2d 368, 373, cert. denied, Seals v. Louisiana, 520 U.S. 1199, 117 S.Ct. 1558, 137 L.Ed.2d 705 (1997); State v. Buffington, *186 97-2423, p. 9 (La.App. 4 Cir. 2/17/99), 731 So.2d 340, 346.
Perez submits the failure to object should not preclude review because the incorrect jury instruction concerning the definition of the crime raises constitutional issues. However, in State v. LeBlanc, 97-1388 (La.App. 4 Cir. 9/23/98), 719 So.2d 592, this Court refused to consider the defendant's claim that the trial court erred in giving a specific intent instruction to the jury regarding attempted second degree murder-although the court went on to note that the error was harmless. More recently, in State v. Davis, 97-1827 (La.App. 4 Cir. 3/10/99), 732 So.2d 79, this Court held that the failure to object to an erroneous reasonable doubt instruction precluded appellate review of the alleged error.
We decline to address this assignment of error because Perez failed to object and preserve the issue for appellate review.

ASSIGNMENT OF ERROR NO. 5
By this assignment of error, Perez claims the evidence was insufficient to convict him of first degree murder.
This court set out the standard for reviewing convictions for sufficiency of the evidence in State v. Nogess, 98-0670 (La. App. 4 Cir. 3/3/99), 729 So.2d 132, as follows:
In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of act could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Green, 588 So.2d 757 (La.App. 4 Cir.1991). However, the reviewing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305 (La.1988). The reviewing court must consider the record as a whole since that is what a rational trier of fact would do. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier's view of all the evidence most favorable to the prosecution must be adopted. The fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Mussall; Green; supra. "[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence." State v. Smith, 600 So.2d 1319 (La.1992) at 1324.
In addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. This is not a separate test from Jackson v. Virginia, supra, but rather an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La. 1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, 504 So.2d 817 (La.1987).
98-0670, pp. 8-9, 729 So.2d at 136-137.
To convict Perez the State had to prove beyond a reasonable doubt that he killed Officer Chris McCormick while having the specific intent to kill or inflict great bodily harm upon a peace officer who was engaged in the lawful performance of his duties. La. R.S. 14:30(A)(2). Specific intent need not be proven as a fact, but may be inferred from the circumstances of the transaction and the actions of the defendant. State v. Maxie, 93-2158, p. 11 (La. 4/10/95), 653 So.2d 526, 532; State v. Sciortino, *187 98-2418, p. 5 (La.App. 4 Cir. 11/25/98), 724 So.2d 258, 261.
Perez admitted firing the shot that killed Officer Chris McCormick. The bullet struck Officer McCormick at nipple level, just to the left of the midline of his chest, and penetrated his heart and left lung, coming to rest under his shoulder blade. It can be inferred from these circumstances that when Perez fired that shot to Officer McCormick's chest he intended to kill or inflict great bodily harm upon him.
It will be assumed for the sake of argument that to convict Perez of first degree murder of a peace officer, the jury had to find beyond reasonable doubt that he knew he was shooting a peace officer engaged in the lawful performance of his duties. The shooting occurred at approximately 11:40 p.m. Officer McCormick was shot at the bottom of the rear stairs leading from Debbie Mastio's apartment into the back yard. Debbie Mastio testified that there was an outdoor light on the upper left side of her second-floor rear door, as one exits the door. This would have been at the top of the stairs. She stated that it was only "dimly lit" underneath the stairs where the hot water heater was located, inside of a utility shed. When Ms. Mastio went out to check on her water heater, she leaned over he stairs and used a flashlight to shine down underneath the stairs, toward her utility room. So did Dr. Black, when he went out to check on the person she had seen. However, Officer McCormick was shot at the bottom of the stairs, a position in which he must have been illuminated to some degree by the back porch light. Dr. Black said Officer McCormick was shot just as he turned at the bottom of the stairs-just as he turned toward defendant. The fatal bullet was recovered underneath the skin of Officer McCormick's back, below his shoulder blade. The autopsy protocol shows the location of the entrance wound and the location of the bullet when it stopped, evidencing that the bullet traveled at a slight angle after entering the chest at the nipple level, slightly to the left of the midline of the chest. Thus, Officer McCormick, in full uniform, was almost directly facing defendant when defendant shot him. A single spent .25 caliber cartridge casing was recovered from the utility shed. With defendant located in or very near the utility shed, underneath the stairs, he would have been in the dark. Officer McCormick, again, right near the bottom of the stairs, which led straight down to the yard, would have been bathed in some light from the back porch light.
In addition to numerous photographs of the homicide scene being introduced at trial, the jury visited the scene of the homicide. While the record does not reflect precisely at what time the visit to the scene occurred, it occurred after the court's dinner break on March 12, 1996. The court can take judicial cognizance of the fact that daylight savings time does not begin until April. Thus, it can be concluded that the jury viewed the scene during darkness. Also, the State represents that the jury saw the scene as it was on the night of the homicide.
Perez was hiding on the night of the shooting. He knew he had brandished a gun at a security officer earlier in the day, and at Ms. Mastio and Dr. Black in Ms. Mastio's backyard. Notably, he had not fired at either Ms. Mastio or Dr. Black. However, he chose to fire at Officer McCormick, a police officer in full uniform. It could have been inferred by the jury that he fired at Officer McCormick, but not Ms. Mastio or Dr. Black, precisely because Officer McCormick was a police officer and he did not want to go to jail.
Considering all of this evidence in a light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that Perez killed Officer McCormick with the specific intent to kill or inflict great bodily harm upon him, knowing that he was a peace *188 officer engaged in the lawful performance of his duties.
Although the grand jury indictment also charged Perez with first degree murder on the ground that he intended to kill or inflict great bodily harm on more than one person, the record does not support a conviction on that ground. The State does not even address that aspect of defendant's sufficiency claim.
This assignment of error has no merit.

DECREE
For the foregoing reasons, Perez's conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] A portion of the lunacy hearing was also held on October 8, 1997.
[2] The sentencing transcript is dated May 27, 1998. However, the minute entry states that sentencing was on March 27, 1998. The docket master states that sentencing was on March 27, 1998. The form committing defendant to the custody of the Department of Corrections states that sentencing was on March 27, 1998. The notice of appeal states that it was filed on March 27, 1998.
[3] The transcript was received in the Judicial Administrator's office on July 14, 1998, and subsequently filed in this court.
[4] In other words, Perez could assist his attorney in presentation of his defense in court, could appreciate the nature of the charges and the proceedings against him, and could effectively participate in his own defense.
[5] Neither the trial transcript, minute entries, nor the docket master reflect that the jury was sequestered in this capital case as required by La.C.Cr.P. art. 791(B). However, upon request by this court, the trial court issued a per curiam attesting that the jury had been sequestered "[o]n each and every day of both the guilt phase and the penalty phase of this case." The per curiam does not reflect that each juror was sequestered after he or she was sworn, as required by La.C.Cr.P. art. 791(B). However, Perez does not raise the issue of any defect in sequestration, and the record does not show any error or prejudice to him in this regard. See State v. Robertson, 97-0177, p. 16 (La. 3/4/98), 712 So.2d 8, 23, cert. denied, Robertson v. Louisiana, ___ U.S. ___, 119 S.Ct. 190, 142 L.Ed.2d 155 (1998).
[6] Defendant cites State v. Clark, 97-0359 (La. App. 4 Cir. 11/12/97), 703 So.2d 131, writ granted, remanded, 97-3184 (La.4/24/98), 717 So.2d 1165, on remand, 97-0359 (La.App. 4 Cir. 10/7/98), 720 So.2d 134, where Mr. Michaelson was barred at the last minute from questioning an expert medical witness on behalf of the defense in a May 1996 second degree murder trial because at that time he was not qualified to be a student practitioner under Rule XX. Presumably, this was because, although a law student, he was not yet a third-year law student, as required by the rule. However, the record indicates that at the time of the March 1998 trial in the instant case, Mr. Michaelson was a third-year law student. Therefore, Clark has no bearing on this case.
[7] Chapter 1 further provides that the indigent defense rules are not intended to confer upon an indigent defendant substantive rights beyond those recognized by the federal and state constitutions, and enactments of the legislature, nor intended to be used to determine the validity of a conviction. See State v. Gradley, 97-0641 (La.5/19/98), 745 So.2d 1160.
[8] New Rule XXXI(B) provides that the rule is not intended to form a basis for a procedural or substantive attack in any case, nor confer any substantive or procedural rights in favor of any accused beyond rights already recognized by the federal or state constitutions, or the laws or jurisprudence of this state.
[9] There was no explanation why Dr. Salcedo did not mention the January 30, 1998 examination by he and Dr. Deland, which would have been his second examination, making Dr. Salcedo's May 1997 examination his third examination.