779 So.2d 17 (2001)
STATE of Louisiana
v.
Spencer MORGAN.
No. 99-KA-2685.
Court of Appeal of Louisiana, Fourth Circuit.
January 17, 2001.
*19 Harry F. Connick, District Attorney, Juliet Clark, Assistant District Attorney, New Orleans, LA, Counsel for Plaintiff/Appellee.
Amy C. Ellender, Louisiana Appellate Project, Mer Rouge, LA, Counsel for Defendant/Appellant.
Court composed of Judge BAGNERIS, Judge TOBIAS, and Judge GORBATY.
GORBATY, Judge.
Defendant Spencer Morgan was charged by grand jury indictment on May 29, 1997 with aggravated rape, a violation of La. R.S. 14:42. Defendant pleaded not guilty at his June 9, 1997 arraignment. On July 22, 1997, following a lunacy hearing, the trial court found defendant competent to proceed. On August 10, 1998, defendant withdrew his not guilty plea, and entered a plea of not guilty by reason of insanity. Defendant waived his right to trial by jury, and a bench trial proceeded on that date. Trial was recessed until September 24, 1998, to allow the State to gather evidence to rebut the defense of insanity at the time of the offense. On February 3, 1999, the trial court rendered its verdict of guilty as charged. Defendant waived all legal delays and was sentenced to life imprisonment, without benefits. Defense counsel noted an objection to the sentence, and the trial court granted defendant's motion for appeal.

FACTS
P.C.[1] testified that she had two children, ages thirteen and fourteen. The fourteen-year-old, L.C., was defendant's child. *20 P.C., who was twenty-nine years old at the time of trial, testified that she became pregnant with L.C. when she was fourteen years old. P.C. said that L.C. spent the previous Easter holidays with defendant's sister, I.M.[2] During that time I.M. notified her that defendant had raped L.C. She found L.C. crying and screaming at University Hospital. Since the alleged rape, L.C. wakes up screaming and hollering and is depressed. L.C. attempted to kill herself, was subsequently hospitalized for three weeks, and continues to receive counseling. P.C. said L.C. had never attempted suicide or been depressed before the rape. L.C. said that after his arrest defendant telephoned her home from jail, seeking to have L.C. drop the charges. She stated on cross-examination that defendant's mother offered L.C. money to drop the charges, and told L.C. that she was sick and had already lost three of her children. P.C. admitted that L.C. had a fifteen-year-old boyfriend at the time of the rape, but said she was also a "B" honor roll student. There was no indication that L.C. had been infected with any disease as a result of the alleged rape.
Dr. Quynh Vu, a fourth-year pediatric resident at Tulane Hospital, performed a rape examination of L.C. in March 1997. She said L.C. had a flat demeanor at first, but that when P.C. entered, she started crying. L.C. sucked her thumb a lot throughout the exam. L.C. gave a history of going to her father's home at his request, where he grabbed her and a struggle ensued. He held a knife to her at one point, then tossed it aside. He dragged her into a bedroom, threw her onto a bed, and told her to take off her clothes. He vaginally penetrated her with his penis, then turned her around and unsuccessfully attempted to insert his penis into her anus. He reinserted his penis into her vagina, ejaculated outside, then told her to wipe herself. She ran out the back door when her grandmother telephoned for defendant. Dr. Vu said that at the time she examined the victim she had performed from three to five rape exams, and that since examining the victim in this case she had performed perhaps two more. She said she had positive physical findings in only one of those exams, and found no positive physical findings in the instant case. This could be explained, she said, by ejaculation occurring outside of the body, and the individual's showering or washing before the examination. Dr. Vu later testified on cross-examination that the history reflected that the victim had bathed in the morning. As to trauma, she said sometimes there is not a lot of struggle involved. Dr. Vu said the hospital intake sheet reflected that the patient came in at 2:35 a.m. Defense counsel asked Dr. Vu to read the history into the record. In addition to the history previously testified to, it reflected that defendant threatened to kill the victim if she did not have sex with him. Dr. Vu found no trauma or damage to any part of the victim's body. She said there was no hymeneal tissue present, but could not say whether that related to the alleged rape. The history also reflected that the victim reported that after attempting to penetrate her anally, "he inserted his penis into her vagina from behind and ejaculated." But then she reported that he pulled out his penis and she did not feel him ejaculate inside her. Dr. Vu said it was not all that clear to her from the history whether the victim was saying that the defendant ejaculated inside her. Dr. Vu said the negative test results for seminal fluid or spermatozoa would be consistent with the history if it were interpreted to mean that ejaculation occurred outside of the body.
New Orleans Police Officer Glenn Burmaster testified that he took defendant's fingerprints in court that day, and matched those to fingerprints on the back of an arrest register contained in a bill of information packet relating to an October 2, 1991 arrest.
*21 K.B.,[3] twenty-one years old at the time of trial, testified that defendant raped her on October 2, 1991, when she was thirteen. Defendant lived in the other half of a double residence on Josephine Street, where her friend lived. K.C. was then living in the 2800 block of Josephine Street. Defendant lured her to his door, then grabbed her, pulled her inside, locked the door, and told her if she hollered he was going to kill her. He took her into his bedroom, took off her clothes, threw her down on the bed, and started raping her and performed cunnilingus on her. She said defendant had something underneath a towel, which she thought was a knife. She did not remember whether defendant had ejaculated. K.C. admitted that defendant was acting like he was on drugs. She said he was very afraid to let her go, because he knew she was going to tell her mother, and that her mother would call the police. K.C. said she had never talked to L.C.
New Orleans Police Officer Mark McCraney investigated the instant rape case in March 1997. He went to 2510 Thalia Street, Apartment "F," where the victim's aunt told him that the victim had been raped by her biological father. The victim confirmed this. Officer McCraney said she was crying and kind of scared. He turned the case over to the Child Abuse Unit. The victim directed him and his partner to a double residence on Josephine Street, where the rape occurred. He knocked on the door, but no one answered. The victim said she had escaped through the back door, but he said that door was locked. Officer McCraney did not see any marks or bruises on the victim, nor notice any torn or ragged clothing.
New Orleans Police Child Abuse Unit Detective JoAnn Verrett responded to the rape call after being notified by Officer McCraney. She said a knife had been involved. Det. Verrett drove the victim and her aunt, I.M., to defendant's residence at 2605 Josephine Street. Afterward, terward, she dropped I.M. off at home, as I.M. feared for her own daughters' safety, because defendant had not been apprehended. Det. Verrett took the victim to the hospital, and said that the victim appeared calm during the drive. Det. Verrett said defendant was arrested later that morning. She learned he had been living with his brother at the Josephine Street residence, and went there two more times in unsuccessful attempts to speak to someone. She discovered that defendant was a registered sex offender, who had listed his mother's telephone number. Det. Verrett called the mother's residence, and was told that defendant's brother had moved all of the contents out of 2605 Josephine Street. Therefore, Det. Verrett said she did not bother obtaining a search warrant for the residence. Defense counsel played a 911 tape of the complaint call. Det. Verrett said the person on the tape sounded "like the same person that [she] investigated," and admitted that the caller, apparently the victim, twice indicated that there had been no weapon involved.
L.C., who was fourteen years old and in the ninth grade, testified that her father telephoned her aunt's home, and said he needed to talk to her. She met him at the police station, which was approximately halfway to the Josephine Street residence. He took her to the residence and locked the iron security door and front door after they entered. He started grabbing her, and she ran into the kitchen to get away. Defendant followed, and picked up a knife from the counter. He told her that he did not have a life, and that he would take hers. He ordered her into his bedroom, and she complied, because she was afraid he would stab her. He told her to take off her clothes, and he took off his clothes. He told her to lie on the bed, and he got on top of her. He penetrated her vaginally, then turned her over and tried twice to penetrate her anally, first putting some lotion on himself. He was unsuccessful, and then put his penis into her vagina *22 again. L.C. said defendant pulled his penis out and ejaculated onto his sheets. He got a towel and told her to wipe herself, which she did, and then got dressed. Her grandmother telephoned, and defendant left the house. She unlocked the back door and left. When she returned to her aunt's home, she told her what happened. Her aunt told L.C. to call the police. L.C. said she told the police that defendant did not have a weapon because she was nervous and wanted police to hurry over. She also said she did not remember if she told the police who came, the doctor at the hospital, or her mother that defendant had been armed with a weapon. She said that since the rape she has had nightmares, and falls asleep at school. She said she took pills to kill herself because she blames herself for her father raping her. L.C. said that her cousin telephoned her for her grandmother, and told her that the grandmother would give her money if she did not testify against defendant.
L.C. testified on cross-examination that defendant put lotion on himself before he first penetrated her. She could not remember telling police about the lotion, and said the first time she said anything about the lotion was to the assistant district attorney. She also told them about the knife. L.C. said that her father drove with her aunt and her grandfather to pick her up at her mother's home in Kenner for the Easter visit. Her aunt and grandfather had dropped off her father at a store, and picked him up after they got her. When they got to Aunt I.M.'s home, she visited with defendant, and he told her that he loved and missed her. She said defendant got mad at her when she told him "about a boy," presumably someone she was dating. L.C. admitted sucking her thumb since she was a baby. L.C. said she had been to her father's home a few days before he raped her, and remembered his probation officer coming over. The probation officer asked her if her father had touched her. L.C. said she left her bra and panties at defendant's home, and was wearing only her shirt and shorts when she left there after the rape.
Reverend Leonard Banks testified that he had been a pastor at Greater Full Augusta Church of the Lord Jesus Christ for over twenty-seven years, and had baptized defendant, who was a member of his church. Reverend Banks said he was the defendant's minister when defendant was in prison for the first rape charge.
Gertrude Travis, defendant's mother, testified that in late March 1997, P.C., the victim's mother, telephoned her and asked her to speak to defendant, because P.C. was having a problem with the victim. P.C. complained to her that L.C. was dating a nineteen-year old, and smoking marijuana. Ms. Travis recalled that defendant had just gotten out of jail. Defendant and his stepfather picked up L.C., and she went to stay with Ms. Travis' daughter, I.M. Ms. Travis said she told L.C. she would give her some money to purchase Easter clothes. She claimed that the next day defendant came to her home to pick up some food for L.C., but later told her that when he returned with the food L.C. had gone. I.M. later telephoned her and informed her of the rape allegation, and she spoke with L.C. and said she would take her to the hospital if she needed to go. Ms. Travis said she had not spoken to L.C. since that night, and denied offering her money, directly or indirectly, to drop the charges against defendant. Ms. Travis admitted that three of her sons were deceased. She said defendant was diagnosed as a slow learner when he was a student in the Orleans Parish Public School system, and said he did not attend high school. Ms. Travis said that defendant experienced psychological problems when her husband, defendant's father, died in 1979. She said defendant was treated with medication, and that after being released from prison, he had made a doctor's appointment to obtain medication. He was arrested before the appointment. She said that when defendant is not on his medication he becomes restless. She recalled *23 when he was placed in the Feliciana Forensic Facility after his last arrest. Ms. Travis admitted on cross examination that she knew defendant had pleaded guilty to raping a girl in 1991, but said he did so because the judge told her that if he did not accept the plea bargain he would sentence defendant to twenty years on each count if he was convicted. She did not know of convictions for assault and theft. Ms. Travis said she rented the apartment at 2605 Josephine Street with money from defendant's SSI check, intending that he would live there after he got of prison. However, she testified that one of her other sons, Curtis, was living there at the time of the alleged rape, while defendant had been staying with her. She did not know why defendant had taken the victim to the Josephine Street apartment. Ms. Travis stated on redirect examination that defendant received a SSI check for a mental disability, and had been receiving it for approximately three years, as of the time of trial.
Harry Travis, defendant's stepfather, testified that he and defendant went to pick up L.C. at her mother's apartment in March 1997. He said defendant went to the apartment door to get L.C., and came back to the car with her. He denied dropping defendant off at a store.
It was stipulated that if Patricia Daniels and Criminalist Joseph Tafaro would testify, they would testify consistent with their reports, which were introduced into evidence.
Dr. Marc Zimmerman was qualified as an expert in the field of forensic psychology. Dr. Zimmerman examined and tested defendant in Orleans Parish Prison, and also reviewed his medical records from Charity Hospital, Central City Mental Health Center and Orleans Parish Prison. Dr. Zimmerman's tests showed that defendant read and spelled at a second-grade level, and performed arithmetic at a third-grade level. He found defendant to be mentally retarded. This finding was consistent with the records from Charity, a local mental health center, and the Feliciana Forensic Facility. Dr. Zimmerman said medical records show that defendant was diagnosed with paranoid schizophrenia and schizoid affective disorder. Dr. Zimmerman said this was consistent with the antipsychotic medication defendant had been placed on in prison. Dr. Zimmerman said these were major psychological disorders where "the person loses contact with reality." Defendant's Orleans Parish Prison diagnosis was "Psychosis NOS [not otherwise specified]." The diagnosis made in connection with the prior case, relating to the 1991 arrest, was paranoid schizophrenia, with mention of a low I.Q. and retardation. Dr. Zimmerman said defendant also had a long history of substance abuse, primarily alcohol. His general impression was that defendant suffered from one of the schizophrenias, which can be put into remission with medication, and that he probably was learning disabled, as well as retarded. He believed that without his medication, defendant would decompensate into a psychosis. Although the Charity Hospital and mental health center records did not run past 1995, Dr. Zimmerman said the parish prison records showed that defendant was diagnosed with psychosis in August 1997. He further stated that defendant had been diagnosed with schizophrenic disorders for the past twelve to fifteen years. He opined that without his medication, defendant would function on the intellectual level of a four to six year old. He did not believe someone of that functional age would have the ability to comprehend the concept of rape, and would find it very hard to believe that such a person could distinguish between right and wrong. Dr. Zimmerman supposed that one would be able to understand rape or sexual abuse by early adolescenceage eleven to thirteen.
Dr. Zimmerman met with defendant one day in May 1998, over one year after the crime, for between two to four hours. He classified defendant as retarded because he determined that defendant had an I.Q. *24 of less than fifty. Dr. Zimmerman acknowledged that even with defendant's limitations, with proper supervision he could work at a fast food restaurant. Dr. Zimmerman said that he was not aware of anything about defendant's condition that would manifest itself in the rape of young girls. Defendant told him he did not commit the rape.
The court questioned Dr. Zimmerman as to whether, if a person such as defendant took a child behind closed doors, and locked the doors, before molesting her, that would indicate the person knew the difference between right and wrong. The court compared that case to the case of a child who goes into a store and takes something and hides it in his pocket, versus taking it and walking out with it or eating it, if it was an edible item. Dr. Zimmerman responded by stating simply that the person might know they would be punished for doing it, but still not know that it was wrong, or said such a person might think that someone could take it away from them, and thus hide it for that reason. Dr. Zimmerman said he did not think defendant could distinguish right from wrong, but could understand what he would be punished for. Dr. Zimmerman replied in the affirmative when asked whether defendant could do something wrong, believing he would be punished for it, but still not know it was wrong. On redirect examination, he acknowledged that locking the door or going inside of a building could be an animal instinct.
Following Dr. Zimmerman's testimony, trial was recessed until September 24, 1998.
Dr. Rafael Salcedo was qualified by stipulation as an expert in the field of forensic psychology. Dr. Salcedo examined defendant on August 25, 1998 relative to insanity at the time of the offense. Dr. Salcedo first said that because defendant claimed he did not commit the offense, logically, he could not be found insane at the time of something he did not do. However, beyond that, his examination did not reveal any evidence of a mental disease or defect that would presently affect, influence or impair defendant's ability to distinguish right from wrong. Consequently, he found no evidence that defendant was suffering from such a mental defect at any point in the past. Dr. Salcedo admitted on cross-examination that he did not "go very far down that road," apparently meaning that he did not thoroughly pursue the issue of insanity at the time of the offense. However, he also said that while defendant may have a history of mental problems, and could have mental problems, such problems did not reach the threshold to where his sanity at the time of the alleged offense would have been compromised. Dr. Salcedo noted that at the time he evaluated defendant to determine his competency to proceed, in July 1997, defendant was not taking any medication, and he found that defendant was not psychotic. Defendant was on medication at the time of the August 1998 examination to determine sanity at the time of the offense, and Dr. Salcedo found no difference in defendant's demeanor between the first and the second examinations. Dr. Salcedo said that while defendant may have borderline mental functioning and a history of learning disability, clinically he did not appear retarded. Dr. Salcedo said he did not administer an I.Q. test because did not see a need for it, noting that he had administered thousands of I.Q. tests.
Dr. Richard Richoux, qualified by stipulation as an expert in the field of forensic psychiatry, examined defendant on August 25, 1998. He heard Dr. Salcedo's testimony, confirmed that his opinion would be the same, and that he would not add or subtract anything. He was not convinced that defendant suffered from a major mental illness at the time he examined him, but stated that if defendant was, it was in remission at the time he examined him. However, Dr. Richoux found no evidence that defendant was suffering from a mental disorder in March 1997 which would have rendered him unable to distinguish *25 right from wrong. Dr. Richoux further noted that defendant had specifically denied culpability for the offense for which he was being tried. He said that unless defendant was actively hallucinating when denying culpability, then such denial was not consistent with an individual who was insane at the time of the offense, which assumes that he committed the offense. Dr. Richoux said he considered Dr. Salcedo's findings from the July 1997 examination as to competency to proceed in reaching his opinions. Dr. Richoux conceded that if someone is mentally retarded, that person would never get better to the point where he or she is not mentally retarded. He did not believe defendant was mentally retarded, but conceded that someone else had concluded that defendant had an I.Q. below fifty, and thus, was retarded. He said he could not be certain as to whether defendant had ever been psychotic, but could only say that he was not psychotic when he examined him. Dr. Richoux admitted that if a person had a psychotic illness, which responded to medication, and the person stopped taking medication for a period of time, there would be a good likelihood that at some point he would have a reemergence of psychotic symptoms. Dr. Richoux examined a document from the Feliciana Forensic Facility reflecting an admission diagnosis of probable paranoid schizophrenia and mental retardation. At that time defendant was being prescribed one antipsychotic medication. At the time of discharge one hundred sixty days later, defendant was still classified as schizophrenic, with borderline intellectual functioning. Dr. Richoux said the discharge information indicated that hospital personnel did not believe defendant was mentally retarded at the time of discharge. He believed the first and foremost way to diagnose any mental disease or defect was clinical impressionnot an I.Q. test. Dr. Richoux conceded that staff at the Feliciana Forensic Facility would have been able to evaluate defendant over his one hundred sixty day hospitalization stay much more thoroughly than either he or Dr. Salcedo. He further conceded that, based on the information before him, presumably the hospital records, it was likely possible that at some point in time defendant had manifested symptoms of schizophrenia.

ERRORS PATENT
A review of the record reveals no errors patent.

ASSIGNMENT OF ERROR NO. 1
In his first assignment of error, defendant claims the trial court erred in allowing the victim of a prior crime, K.B., to testify against defendant pursuant to La. C.E. art. 404(B) as evidence of a system or pattern of behavior.
La. C.E. art. 404(B)(1) provides:
Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it plans to use at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding. (Emphasis added).
The general rule of La. C.E. art. 404(B)(1) prohibits the admission of other crimes evidence at trial because of the danger that the trier of fact will convict the defendant of the immediate charge based on his bad character, as evidenced by his prior criminal acts. State v. Jones, 99-0861, p. 17 (La.App. 4 Cir. 6/21/00), 769 So.2d 28, 40. To admit "other crimes" evidence pursuant to one of the exceptions provided by La. C.E. art. 404(B)(1), such evidence must tend to prove a material fact genuinely at issue, and the probative value of the extraneous crimes evidence *26 must outweigh its prejudicial effect. State v. Tilley, 99-0569 (La.7/6/00), 767 So.2d 6. There must be clear and convincing evidence of the commission of the other crimes and the defendant's connection therewith. State v. Hills, 99-1750, p. 5 (La.5/16/00), 761 So.2d 516, 520. Finally, defendant must be given notice and afforded a hearing at which the State must show that the evidence is admissible. State v. Prieur, 277 So.2d 126 (La.1973).
In the instant case, the State argued that the testimony of K.B. concerning defendant's rape of her when she was thirteen years old, was admissible to show a system or pattern. Defendant argued that one prior offense was insufficient to show a system or modus operandi, and also that the crimes were not so peculiarly distinctive so that logically one would say they were the work of one person. However, regardless of whether the testimony of K.B. was admissible as evidence of system or modus operandi, as explained below, it was admissible as evidence of "lustful disposition." Thus, even assuming that the trial court erred in admitting the testimony as evidence of system, any such error was harmless.
"Louisiana has followed the national trend towards broader admissibility of other crimes evidence in cases involving alleged sexual abuse of minor children." State v. Miller, 98-0301, p. 4 (La.9/9/98), 718 So.2d 960, 963, citing Pugh, Handbook on Louisiana Evidence Law 1996, 284. In Miller, the court noted that it had first recognized the "lustful disposition" exception in State v. Cupit, 189 La. 509, 179 So. 837 (1938), where evidence that the defendant charged with assault with intent to commit rape of his young niecehad raped another niece and had been charged with the rape of a third niece was admissible in that "the prior offenses ... clearly tended to show the lustful disposition the defendant bore towards his nieces, and his unnatural desire to have sexual intercourse with them; all of his nieces being children of tender age." Miller, 98-0301 at p. 6, 718 So.2d at 963, citing Cupit, 189 La. at 516, 179 So. at 839.
In State v. Black, 98-0457 (La.App. 4 Cir. 3/22/00), 757 So.2d 887, the defendant was charged with the aggravated rape of a juvenile, and nine counts of molestation of a juvenile. The defendant pleaded guilty to eight of the nine counts of molestation, and was tried on the aggravated rape count. Following a Prieur hearing, the trial court ruled that evidence of prior acts of molestation of the victim's two sisters were admissible. This court affirmed that ruling, holding that the evidence was admissible to show lustful disposition.
The instant case fits squarely within the "lustful disposition" exception to the rule against admitting evidence of other crimes. K.B. testified at the motion hearing that defendant raped her in 1991, when she was thirteen years old. The State asserted, without objection, that defendant pleaded guilty to forcible rape in connection with the offense, in exchange for a six-year sentence. Defense counsel did not argue that the crime did not occur, and the fact that the crime occurred was not an issue. "If credible, the testimony of a single witness may establish the elements of a crime beyond a reasonable doubt." State v. Womack-Grey, 99-0416, p. 17 (La.App. 4 Cir. 5/17/00), 764 So.2d 108, 119. Thus, the trial court properly found, implicitly by clear and convincing evidence, that defendant committed the prior crime.[4] The victim in the instant case was fourteen years old at the time of the alleged rape. Thus, the evidence of the prior rape was relevant to prove defendant's lustful disposition for minor, adolescent females. The case was tried before the bench, and it is presumed that the trial court could consider the evidence for the limited purpose for which it was admitted, and not consider it *27 as evidence of defendant's bad character. Although the State gave notice of its intent to introduce the evidence to prove "system," not lustful disposition, defendant was advised of the other crimes evidence sought to be introduced, and afforded a hearing at which the State presented sufficient proof to establish the admissibility of the evidence.
There is no merit to this assignment of error.

ASSIGNMENT OF ERROR NO. 2
In this assignment of error, defendant claims the evidence was insufficient to support his conviction for aggravated rape.
This court set out the well-settled standard for reviewing convictions for sufficiency of the evidence in State v. Ragas, 98-0011 (La.App. 4 Cir. 7/28/99), 744 So.2d 99, as follows:
In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Green, 588 So.2d 757 (La.App. 4 Cir.1991). However, the reviewing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305 (La.1988). The reviewing court must consider the record as a whole since that is what a rational trier of fact would do. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier's view of all the evidence most favorable to the prosecution must be adopted. The fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Mussall; Green, supra. "[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence." State v. Smith, 600 So.2d 1319, 1324 (La.1992).
In addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. This is not a separate test from Jackson v. Virginia, supra, but rather an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La. 1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, 504 So.2d 817 (La.1987).
98-0011 at pp. 13-14, 744 So.2d at 106-107, quoting State v. Egana, 97-0318, pp. 5-6 (La.App. 4 Cir. 12/3/97), 703 So.2d 223, 227-228.
Defendant was convicted of aggravated rape, a violation of La. R.S. 14:42. This court set out the elements of aggravated rape pertinent to the instant case in State v. Johnson, 99-1117, pp. 6-7 (La.App. 4 Cir. 5/17/00), 764 So.2d 1113, 1118, as follows:
La. R.S. 14:42 defines aggravated rape as "a rape committed upon a person... where the anal or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed ... [w]hen the victim is prevented from resisting the act because the offender is armed with a dangerous weapon." "Rape is the act of anal or vaginal sexual intercourse with a male or female person committed without the person's lawful consent.... Emission is not necessary and any sexual penetration, vaginal or anal, however slight *28 is sufficient to complete the crime." La. R.S. 14:41.
764 So.2d at 1118.
In Johnson, the victim claimed she was raped inside of her office after arriving in the morning. A medical examination revealed blunt trauma between her thigh and pelvis and to her right breast, but no seminal fluid or semen were found. The victim's dentist-employer testified that she was crying and upset when he arrived at the office shortly after the rape. The victim first stated to her dentist-employer and police officers that the defendant penetrated her with a knife with which he was armed, and/or his finger. However, she testified that she was emotionally distraught did not want to confront the reality that the defendant had raped her. There were no cuts to the victim's vaginal region. This court found that the evidence was sufficient to support a conviction for aggravated rape.
In the instant case, the conviction rested solely on the testimony of the victim, with no physical evidence of a rape. The examining physician, Dr. Vu, noted that the absence of seminal fluid or spermatozoa could be explained by ejaculation outside of the vagina, which the victim said happened in her case. Dr. Vu also said the absence of physical trauma could be attributable to a rape where there was not a lot of struggle involved, as in the instant case. Dr. Vu said there was no hymeneal tissue present, but could not say whether that was related to the rape. The medical history given by the victim reflects that she was sexually active and had sexual intercourse before the rape. Defendant notes that defendant's mother claimed that P.C., the victim's mother, had asked her to speak to defendant about his daughter's behavior, i.e., dating a nineteen-year old and smoking marijuana. However, P.C. denied any such conversation, admitting only that the victim had a fifteen-year old boyfriend at the time of the rape. The victim admitted that defendant had gotten mad at her when she told him about a boy, presumably the one she was dating. Defendant argues that this evidence shows that the victim was promiscuous and had a motive to falsely accuse him of rape. Defendant, who claims he is a schizophrenic, mentally retarded individual who cannot distinguish between right and wrong, suggests that he simply attempted to discipline his daughter and dissuade her from a life of drug use and promiscuity, and the victim retaliated against him by falsely accusing him of raping her. The trial judge could have rejected this theory. It can be noted that the victim lived in Kenner with her mother, who, all the evidence indicates, had sole custody. Defendant, who was not married to the victim's mother, and lived a distance away in the inner city, had no real control over the victim's behavior. Defendant attacks the victim's credibility by noting that when asked by a 911 operator if a weapon was involved, she twice said no, but then changed her story after police arrived, and claimed defendant threatened her with a kitchen knife. The victim said she did not tell police about the knife because she thought they would come to scene quicker if she said there was no weapon. Admittedly, this is not logical. However, it must be remembered that, allegedly, the victim had just been raped by her father. In addition, the victim said that when she was picked up at her mother's residence in Kenner, defendant was not in the car, but was waiting at a nearby store where he had been dropped off. However, defendant's stepfather said that defendant walked up to P.C.'s front door and got the victim. This testimony is irreconcilable. However, the trial court was in the best position to evaluate the credibility of witnesses. A factfinder's credibility decision should not be disturbed unless it is clearly contrary to the evidence. State v. Harris, 99-3147, p. 6 (La.App. 4 Cir. 5/31/00), 765 So.2d 432, 435. "If credible, the testimony of a single witness may establish the elements of a crime beyond a reasonable doubt." State v. Womack-Grey, 99-0416 (La.App. 4 Cir. 5/17/00), 764 *29 So.2d 108, 119. There is no dispute that the victim was with her father at the time of the alleged rape. Viewing all of the evidence in a light most favorable to the prosecution, any rational trier of fact could have found all of the elements of the crime of aggravated rape present beyond a reasonable doubt.
There is no merit to this assignment of error.

ASSIGNMENT OF ERROR NO. 3
In this assignment of error, defendant argues that the trial court erred in finding that he was sane at the time of the offense.
This court set out the law pertaining to sanity at the time of the offense in State v. Perez, 98-1407 (La.App. 4 Cir. 11/3/99), 745 So.2d 166, writ denied, XXXX-XXXX (La.9/22/00), 768 So.2d 32, as follows:
In Louisiana, a legal presumption exists that a defendant is sane at the time of the offenses. La. R.S. 15:432. To rebut the presumption of sanity and avoid criminal responsibility, defendant has the burden of proving the affirmative defense of insanity by a preponderance of the evidence. La.C.Cr.P. art. 652. Criminal responsibility is not negated by the mere existence of a mental disease or defect. To be exempted of criminal responsibility, defendant must show he suffered a mental disease or mental defect which prevented him from distinguishing between right and wrong with reference to the conduct in question. La. R.S. 14:14; State v. Williams, 346 So.2d 181 (La.1977). The determination of sanity is a factual matter. All the evidence, including expert and lay testimony, along with the defendant's conduct and action, should be reserved for the fact finder to establish whether the defendant has proven by a preponderance of the evidence that he was insane at the time of the offense. State v. Bibb, 626 So.2d 913 (La.App. 5th Cir. 1993), writ denied, 93-3127 (La.9/16/94); 642 So.2d 188; State v. Claibon, 395 So.2d 770 (La.1981). Lay testimony pertaining to defendant's actions, both before and after the crime, may provide the fact finder with a rational basis for rejecting unanimous medical opinion that the defendant was legally insane at the time of the offense. State v. Peters, supra; State v. Claibon, supra.

In reviewing a claim for insufficiency of evidence in an action where an affirmative defense of insanity is raised, this court, applying the standard set forth in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), must determine whether under the facts and circumstances of the case, any rational fact finder, viewing the evidence most favorable to the prosecution, could conclude, beyond a reasonable doubt, that the defendant failed to prove by a preponderance of the evidence that he was insane at the time of the offense. State v. Peters, 94-0283 (La.10/17/94); 643 So.2d 1222; State v. Nealy, 450 So.2d 634 (La.1984); State v. Price, 403 So.2d 660 (La.1981); State v. Claibon, supra; State v. Roy, 395 So.2d 664 (La.1981).
98-1407 at pp. 26-27, 745 So.2d at 181, quoting State v. Silman, 95-0154, p. 7 (La.11/27/95), 663 So.2d 27, 32.
Defendant's expert witness, forensic psychologist Dr. Marc Zimmerman, who examined defendant for two to four hours in May 1998, over one year after the crime, and reviewed his medical history, testified that defendant suffered from schizophrenia, a disease with which he said defendant had been diagnosed with for the past twelve to fifteen years. Dr. Zimmerman believed the disease could be put into remission with medication, but that without the medication defendant would decompensate into psychosis. Medical records indicated that defendant had been receiving an antipsychotic medication in prison, but his mother testified that he had been without any medication since he left prison and returned to live with her. Dr. Zimmerman also found that defendant was learning disabled; he read and spelled at a secondgrade *30 level, and performed arithmetic at a third-grade level. Finally, Dr. Zimmerman found that defendant was retarded, because of his low I.Q. He said that without medication defendant would function at the level of a four to six-year old, and would not have the ability to comprehend the concept of rape. He said he would find it very hard to believe that such a person could distinguish between right and wrong.
Dr. Salcedo, the State's expert forensic psychologist, examined defendant to determine his competency to proceed in July 1997, shortly after the March 1997 crime, when defendant was on no medication, and found no psychosis. Defendant was on medication at the time Dr. Salcedo examined him in August 1998 to determine sanity at the time of the offense, and he found no difference in defendant's demeanor from one examination to the other. He believed that even if defendant had borderline mental functioning and a history of learning disability, clinically he did not appear retarded. Dr. Salcedo found no evidence to suggest that defendant was unable to distinguish between right and wrong at the time of the offense in the instant case.
Dr. Richoux conceded that, based on the information before him, presumably the hospital records, it was "likely possible" that at some point in time defendant had manifested symptoms of schizophrenia. He said he found no evidence of such a disorder at the time he examined defendant in August 1998, but said that if defendant was schizophrenic, the disease was in remission at that time. Dr. Richoux did not believe defendant was retarded. He found no evidence that defendant was suffering from a mental disorder in March 1997 which would have rendered him unable to distinguish right from wrong.
The trial court could have accepted the testimony of Drs. Salcedo (who examined defendant four months after the crime) and Richoux, and rejected that of Dr. Zimmerman. Viewing all of the evidence in a light most favorable to the prosecution, any rational trier of fact could have found that defendant failed to prove by a preponderance of the evidence that he was unable to distinguish between right and wrong at the time he raped his daughter.
There is no merit to this assignment of error.

CONCLUSION
For the foregoing reasons, the defendant's conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] In accordance with La. R.S. 46:1844, to protect the identity of the victim, a minor, she and her mother will be referred to by their initials, L.C. and P.C.
[2] To protect the identity of the victim, her aunt will be referred to by her initials, I.M.
[3] To protect the identity of the victim, the witness will be referred to by her initials, K.B.
[4] The bill of information packet evidencing the arrest and conviction was introduced in evidence at trial.