643 So.2d 1222 (1994)
STATE of Louisiana
v.
Brian A. PETERS.
No. 94-K-0283.
Supreme Court of Louisiana.
October 17, 1994.
*1223 Richard P. Ieyoub, Atty. Gen., Harry F. Connick, Dist. Atty., Susan M. Erlanger, New Orleans, for applicant.
Roger W. Jordan, Jr., New Orleans, for respondent.
WATSON, Justice.[1]
Brian Peters was indicted for the first degree murder of his estranged wife, Michelle Yarls, in violation of LSA-R.S. 14:30. Peters subsequently pleaded not guilty and not guilty by reason of insanity. After appointment of a sanity commission, the trial court declared Peters incompetent to proceed to trial and remanded Peters to the Feliciana Forensic Facility. After administration of anti-depressant medication and therapy, Peters was declared competent for trial. A jury found Peters guilty as charged and recommended a life sentence. The trial court denied defense motions for new trial and for post-verdict judgment of acquittal and sentenced Peters to life imprisonment. The appellate court reversed Peters' conviction, finding the evidence proved by a preponderance that Peters was insane at the time of the offense. State v. Peters, 93-0879 (La. App. 4 Cir. 1/13/94), 630 So.2d 8. This court granted a writ to review that finding. 94-0283 (La. 6/17/94), 638 So.2d 1075. After review of the record, we affirm.

FACTS
Shortly after 11 p.m. on November 15, 1988, Peters kicked a hole in the front door of Joycelyn Yarls' house where Peters' estranged wife, Michelle Yarls, was staying *1224 with her mother. Mrs. Yarls and Michelle saw Peters leave their front porch and ride his bicycle to the corner. Mrs. Yarls called the police and told her two other children who lived with her, Patrice and Byron, about the incident. Mrs. Yarls also called Peters' mother and told her she was going to have Peters arrested for damaging her property.
About an hour and a half later, Byron Yarls was waiting for the police outside his mother's house when he saw Peters approaching on his bicycle. When Byron noticed Peters carrying a chrome gun, Byron turned and ran around the house. Peters chased Byron and shot at him two or three times. Byron escaped by jumping over a gate and running to a neighbor's house.
Mrs. Yarls heard her daughter, Michelle, scream out, "He is in the house and he has a gun." Mrs. Yarls was looking for a means of defense when she saw Peters in a bedroom doorway. Peters told her he was going to kill her. She tried to close the door but Peters pushed the door open and hit her in the lip and arm. Peters tried to get his gun straight in the confined space, but Mrs. Yarls pushed him. Peters fell as the gun fired. Mrs. Yarls thought she was shot and ran down the street to call the police from her sister's house.
Michelle ran into her sister's bedroom to tell Patrice that Peters was in the house and for Patrice and her two-year-old nephew to hide in the closet. Both women would not fit, so Michelle and her nephew stayed in the closet while Patrice hid under blankets on the bed. When Patrice heard a gunshot, she got up to investigate and met Peters in the doorway. Patrice told Peters that Michelle had left the house. Peters pointed the gun at her and Patrice ran outside.
Byron saw Peters leave the house smoking a cigarette. Another sister who lived nearby, Karen Yarls Brookings, was outside and asked Peters what he had done as he exited the Yarls house. Peters only pointed his gun at her, smiled and rode slowly down the street on his bicycle.
Peters told his mother he had killed Mrs. Yarls and Michelle. Peters' mother called to inquire about them. Mrs. Yarls told Peters' mother she would call her back. Michelle was found lying dead on the floor, partly inside the bedroom closet. An autopsy revealed she died from two gunshot wounds to her chest.
Commitment orders for Peters had been obtained by members of Peters' family prior to the shooting. On July 18, 1988, Peters' sister, Bridget Peters Collins, signed a commitment order asserting in part that Peters had a gun and abused drugs, although she had never seen him abuse drugs. She did so after being informed that the city would act on the order only if she asserted Peters was a drug abuser and was in need of counseling, rehabilitation or detoxification. She asserted Peters should be considered violent to himself and to others. Peters was not picked up at this time. On November 10, 1988, Peters' father sought another commitment order. In addition to allegations of drug use and past mental illness, he alleged that Peters had made suicidal statements and was believed to have a gun. At that time, Peters was crying all the time, was not sleeping or eating, and seemed very unstable to his family. On November 13, 1988, three days before Michelle Yarls' shooting, Peters' father again sought a commitment order for Peters stating Peters was a danger to himself and others and had been threatening suicide.
Police officer Harry Parker and his partner had been dispatched to serve commitment orders on Peters at his mother's house on November 16, 1988. Peters was initially hostile to the police but calmed down when he recognized Officer Parker, whom Peters had known for approximately ten years. As the officers placed Peters in their patrol car, the police radio reported on an aggravated burglary where the subject kicked a door in or was shooting. Peters told the officers the call referred to his girlfriend's mother's house a block away and that he had committed the offense. During the ride to Mrs. Yarls' house, Peters asked the officers, "Did she die?" When the officers turned to look at him, Peters said, "My wife." Peters also told the officers the gun and his bicycle were on the porch of his house, also a block away. These were the only intelligible comments made by Peters. Officer Parker later stated *1225 Peters was "talking out of his head," "wasn't making any sense most of the time," and "was doing a lot of gibberish."
Officer Parker found Peters' bicycle and a silver automatic pistol lying on the porch of Peters' residence. Peters was transported to the scene of the shooting where he was positively identified and arrested. Officer Parker did not know if Peters could understood his constitutional rights when read them.
A sanity commission was appointed, its members eventually examining Peters on four separate occasions each. A hearing was held January 19, 1989. Dr. Ritter examined Peters on December 28, 1988, and concluded he was insane at the time of the offense and was not competent to proceed to trial or assist in his defense. This conclusion was shared by Dr. Medina, the other sanity commission member. Based on the doctors' findings, the trial court found Peters incompetent and remanded him to the Feliciana Forensic Facility. Peters was not transferred immediately but stayed in parish prison where antidepressant medication was administered to him. On September 17, 1990, the parish prison psychiatrist, Dr. Juarez, notified the court he felt Peters was faking mental illness and had the competency to proceed to trial.
Based on this information, the sanity commission agreed that Peters should be transferred to Feliciana so that he could be continuously observed and treated. Doctors at Feliciana administered anti-depressant medication and therapy to Peters. After comprehensive evaluation and treatment, the doctors at Feliciana informed the court Peters was competent for trial. Another sanity commission hearing was held. Drs. Ritter and Medina determined Peters was now competent to proceed to trial but, at the time of the offense, Peters was unable to appreciate the usual, natural and probable consequences of his acts; he was unable to distinguish right from wrong; and he was insane at the time of the offense due to his suffering from a major depressive illness. According to Dr. Ritter, Dr. Juarez also concurred in this finding.
The defense presented this evidence to the jury at trial. The state presented no expert testimony to rebut Drs. Ritter and Medina but elicited testimony on cross-examination regarding malingering and the fact that a person could be depressed after the death of a loved one. The state presented testimony that Peters had called the paternal grandmother of Michelle's child a week prior to the shooting to warn her to keep the child away from Michelle, and the fact that no other persons were shot, as evidence that Peters' actions had been considered and rational. The jury found Peters guilty as charged and recommended a sentence of life imprisonment. The trial judge denied Peters' motions for new trial and for post-verdict judgment of acquittal and sentenced him to life imprisonment without benefit of parole, probation or suspension of sentence. On appeal, Peters asserted the trial court erred in denying his motion for new trial. The court of appeal agreed, reversing his conviction, finding that the evidence presented at trial proved by a preponderance that Peters was insane at the time of the offense.

LAW AND DISCUSSION
A legal presumption exists that a defendant is sane and responsible for his actions. LSA-R.S. 15:432. This presumption is rebuttable, however, and the defendant has the burden of establishing the defense of insanity at the time of the offense by a preponderance of the evidence. LSA-C.Cr.P. art. 652. Legal insanity is proved if the circumstances indicate that a mental disease or mental defect rendered the offender incapable of distinguishing between right and wrong with reference to the conduct in question. LSA-R.S. 14:14.
In reviewing a claim of insufficiency of evidence in regard to a defense of insanity, this court applies the test set forth in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), to determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the defendant had not proved by a preponderance of the evidence that he was insane at the time of the offense. State v. Nealy, 450 So.2d 634 (La. *1226 1984); State v. Price, 403 So.2d 660 (La. 1981); State v. Claibon, 395 So.2d 770 (La. 1981); State v. Roy, 395 So.2d 664 (La.1981).
The defendant presented the expert testimony of both members of the sanity commission, Drs. Ritter and Medina, to establish his insanity at the time of this offense. Dr. Ritter testified that even Dr. Juarez, the only doctor to question whether Peters was faking a mental illness, eventually concurred in the sanity commission's findings. In addition, Peters was administered anti-depressant medication for a considerable length of time before he was competent to stand trial. The continuous doses of medication, and the fact that he responded to the medication and therapy, are evidence of the measure of Peters' insanity. See Roy, 395 So.2d at 668. The state presented no expert testimony to rebut this evidence. Although the state may rely on lay evidence to rebut the experts' conclusions, see Price, 403 So.2d at 663; State v. Liner, 397 So.2d 506, 509 (La.1981); Claibon, 395 So.2d at 774, review of the lay testimony shows it is insufficient to support a jury finding that Peters was sane at the time of the shooting.
The circumstances of the shooting itself are neutral on the issue of sanity or insanity. Although the state argues the fact that only Peters' estranged wife was killed shows a considered choice of Peters', the testimony established Peters shot at various members of the Yarls family and threatened others with his weapon. The fact that some family members escaped through good fortune or bad shooting does not establish Peters' sanity. Peters' actions of lighting a cigarette, smiling and riding away on his bicycle are likewise neutral as to whether he was sane or insane. Roy, 395 So.2d at 669; State v. Lozard, 542 So.2d 707 (La.App. 4 Cir.1989), writ denied, 548 So.2d 1245 (La. 1989).
The state suggests a possible motive for the shooting could have been revenge for an earlier altercation when Michelle blinded Peters' right eye. However, this incident occurred almost a year prior to the shooting and there was no evidence connecting the two events. While the testimony of the paternal grandmother of Michelle's child might suggest forethought in harming Michelle, it alone is not sufficient to rebut the expert and lay testimony regarding Peters' insanity at the time of the offense.
Peters' sister testified about his actions just prior to the shooting which led his family to try to have him committed. Officer Parker testified he told Peters he was there to pick Peters up on the commitment papers and that Peters "pretty much knew my reasons for being there." The fact that Peters assumed the officers were there to serve a commitment order, and not because he had just shot his estranged wife, shows he was unable to distinguish between right and wrong. Peters made no attempt to hide the murder weapon but left it on his front porch, which he disclosed to the officers. The officers found most of Peters' conversation unintelligible "gibberish." Officer Parker testified he was not certain Peters understood his constitutional rights when they were read to him.

CONCLUSION
Viewing the evidence in the light most favorable to the prosecution, the jury's verdict on the issue of sanity was contrary to the preponderance of evidence. The court of appeal correctly reversed the defendant's conviction and sentence and remanded the matter to the trial court for further proceedings.
AFFIRMED.
MARCUS and KIMBELL, JJ., dissent and assign reasons.
NORRIS, Judge, dissents for the reasons assigned by KIMBALL, J.
KIMBALL, Justice, dissenting.
The defendant has the burden of establishing the defense of insanity by a preponderance of the evidence, La.C.Cr.Pro. art. 652, and the issue of insanity is a fact issue for the jury to decide. However, on appeal, appellate courts do not review the issue de novo; instead, appellate courts must determine whether, viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could conclude that the defendant *1227 had failed to prove by a preponderance of the evidence that he was insane at the time of the offense. State v. Nealy, 450 So.2d 634 (La.1984). Because proper application of the appellate standard of review in this matter leads me to conclude, on the basis of the evidence adduced at trial, that a rational juror could have concluded that defendant failed to prove by a preponderance of the evidence that he was insane at the time of the offense, I respectfully dissent.
The medical testimony at trial established that defendant had been diagnosed as suffering from deep depression and, in the opinion of the doctors, could not distinguish right from wrong at the time of the offense. However, Dr. Ritter also testified that depression could result from a number of causes, including drug abuse, alcohol abuse, loss of a loved one or loss of a job, and Dr. Medina further testified that being in jail, murdering someone, losing a job, losing a family member, or the aftermath of an accident could make a person depressed. Neither doctor found any evidence that defendant was psychotic or delusional when they examined him in December, 1988, less than two months after the murder. Dr. Ritter specifically ruled out the possibility that the defendant suffered from a manic depressive psychosis and found no significant evidence in the defendant's medical records from Feliciana Forensic Facility that defendant had undergone any treatment for delusional behavior. Finally, Dr. Ritter also testified that the defendant was not eating or sleeping well when he saw him in December, 1988, in part because he was "suffering pangs of guilt over what had happened."
Lay testimony concerning defendant's actions, both before and after the crime, may, however, provide the jury with a rational basis for rejecting even unanimous medical opinion that the defendant was legally insane at the time of the offense. State v. Claibon, 395 So.2d 770, 773-74 (La.1981). In the instant case, lay testimony at trial shows that: 1) defendant had been blinded in one eye by the victim when she kicked him in the head during a previous argument; 2) a week prior to the murder of the victim, defendant called the victim's child's grandmother and warned her to keep the victim's child away from the victim's house; 3) when he returned to the victim's mother's house, where the victim was staying, defendant fired shots at the victim's brother, but did not continue pursuit of the brother after he jumped over a gate and ran to a neighbor's house; 4) after entering the victim's mother's house, defendant fired a shot at the victim's mother, but did not pursue her either as she ran from the house to call the police; 5) upon entering the victim's sister's bedroom, defendant encountered the victim's sister, but allowed her to leave the room unharmed; 6) when he found the victim in a closet, protecting her sister's child, defendant shot the victim twice in the chest at close range, but did not harm the child; and 7) upon leaving the scene of the shooting, defendant rode his bicycle to his house where he left the gun used in the shooting on his front porch, then went to his mother's house, where he informed his mother that he had killed the victim and her mother.
In my view, the lay testimony in this case clearly provides a rational basis for the jury's rejection of the defendant's claim of insanity. A rational juror could have viewed the evidence concerning the victim's blinding of defendant in an earlier altercation as providing a motive for the defendant to kill the victim. A rational juror could have viewed the warning call made by defendant as evidence of defendant's premeditated intent to kill the victim. A rational juror could have viewed defendant's actions at the scene of the shooting, where he specifically hunted and killed only the victim, while allowing others to leave unharmed, as evidence of defendant's specific intent to kill only the victim. A rational juror could have viewed defendant's actions in discarding the weapon at his house before proceeding to his mother's house as evidence of an attempt by defendant to avoid the consequences of his actions. A rational juror could have concluded from the medical testimony that defendant's depression at the time of his examination by the doctors was evidence of his appreciation of the consequences of his actions, and therefore a demonstration that his depressive disease had not rendered him incapable of distinguishing right from wrong. The doctors' testimony was less than completely persuasive, and clearly allowed *1228 for the possibility that defendant's depression at the time of the doctors' examination of defendant was actually a result of defendant's guilt over killing his estranged wife.
Because the medical testimony did not foreclose the possibility that defendant did know right from wrong at the time of the murder, and the lay testimony did provide a rational basis for the jury's decision to reject defendant's claim of insanity, I do not believe there is any basis for this Court's rejection of the jury's determination in this matter. Therefore, I respectfully dissent.
MARCUS, Justice (dissenting).
I believe that, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found that defendant did not prove by a preponderance of the evidence that he was insane at the time of the offense.
First, I believe a reasonable jury could have found the expert medical testimony offered by defendant to be incomplete and unpersuasive. Both Dr. Ritter and Dr. Medina diagnosed defendant as suffering from depression and testified that defendant was unable to distinguish right from wrong at the offense, but nowhere in the medical testimony was it explained how his depression affected his ability to distinguish right from wrong, nor was there any testimony that being depressed would necessarily negate an awareness that what was done would be socially or legally impermissible. Moreover, the doctors admitted that depression could be caused by being in jail or murdering a loved one.
In addition, there was ample lay testimony that cast doubt on the weak medical testimony and indicated defendant's actions were considered and rational. The evidence showed defendant called the paternal grandmother of the victim's child a week prior to the shooting to warn her to keep the child away from the victim. As he searched for the victim, he encountered the victim's mother and two siblings, but did not harm them. When he found the victim, he shot her twice, but left the baby she was holding in her arms unharmed. After he exited the house, he left his gun and bike at his house and went to his mother's house, apparently in an attempt to avoid apprehension. Finally, the state showed that defendant had a possible motive, since the shooting could have been revenge for an earlier incident when the victim blinded his right eye.
Accordingly, I respectfully dissent.
NOTES
[1] Judge William Norris, III, Court of Appeal, Second Circuit, sitting by assignment in place of Justice James L. Dennis; Judge Felicia Toney Williams, Court of Appeal, Second Circuit, participating as Associate Justice Pro Tempore, effective September 1, 1994.

Calogero, C.J., recused. Rule IV, Part 2, § 3.