IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

May 29, 2008

Charles R. Fulbruge III
Clerk

No. 08-30082

SALVADOR PEREZ

Petitioner - Appellee

v.

BURL CAIN, WARDEN, LOUISIANA STATE PENITENTIARY

Respondent - Appellant

Appeal from the United States District Court
for the Eastern District of Louisiana

Before REAVLEY, JOLLY, and GARZA, Circuit Judges.

REAVLEY, Circuit Judge:

The State of Louisiana, through the Respondent, Warden Burl Cain, appeals the district court's judgment granting the 28 U.S.C. § 2254 petition of Salvador Perez. Perez was convicted of first-degree murder of a police officer and sentenced to life in prison for shooting New Orleans Police Officer Chris McCormick. Perez asserted at trial that he was not guilty by reason of insanity. We agree with the thorough and well-reasoned opinion of the district court that the state court unreasonably applied established Supreme Court precedent concerning sufficiency of the evidence because Perez established at trial that he was insane at the time of the offense and that no rational juror could have found otherwise. We therefore AFFIRM the district court's judgment.

## I. Factual and Procedural Background

The factual background of the events leading to Perez's arrest is set forth at length in both the state court decision on Perez's direct appeal and in the district court's opinion granting habeas relief.[1] Perez is currently a 61-year old Mexican citizen who formerly resided legally with his wife, Rosa, and five children on a small farm in Seguin, Texas. On the morning of July 15, 1996, Perez told his wife that he was going out to feed the cows. Instead, he left home with his 12-year old son, Salvatore Perez, Jr., and began a drive that ended with the tragic death of a police officer in New Orleans. Believing that he was being pursued by people who wanted to kill him, Perez proceeded from Seguin toward Florida, where he had once lived. He constantly checked his mirrors for his pursuers and increased his speed to "lose" the other vehicles that he believed were chasing him.

Salvatore Perez, Jr. testified that his father drove on back roads and that he was preoccupied with other vehicles. When they stopped at a convenience store at one point, Perez suddenly became scared and began sounding the horn for his son to return to the vehicle so they could quickly leave. Salvatore Jr. described his father's hands as shaking and also reported that Perez would frequently push buttons on the roof of the vehicle, believing this action would throw off the pursuers. Perez also called his wife Rosa and reported that someone was trying to kill him and that a black car was following him. He also believed that Rosa was being held hostage.

Salvatore Jr. later told police that he and his father slept in a park on the first night. At about 4:00 a.m. or 5:00 a.m., Perez awoke and saw a brown Chevrolet truck in the park that he thought was looking for him. Perez next believed that a reddish car at a gas station was following him. Upon reaching

---

[1] See State v. Perez, 745 So. 2d 166 (La. Ct. App. 1999); Perez v. Cain, __ F. Supp. 2d __, 2008 WL 108661 (E.D. La. Jan. 8, 2008).

New Orleans, Perez and his son ended up at the Fair Grounds. Salvatore Jr. told police that Perez saw the same black car at the Fair Grounds that had been following them from Texas, and Perez thought that "gangsters" who were chasing him were resting in the racetrack barns.

On the morning of July 17, 1996, a Fair Grounds security guard encountered Perez and his son while investigating a report of a suspicious man near the barns. Perez held a small black handgun at his side. He pulled his son close to him and told the guard to leave him alone and not "to take his kid." The guard retreated to call the police, but when police arrived Perez was not found. Later that evening, the Fair Grounds security discovered Salvatore Jr. alone and took him into custody. A police officer testified that Salvatore Jr. said he and his father had come to New Orleans in a van, that they were being pursued by gangs from Texas, and that his mother knew about Perez's behavior. The officer testified that Salvatore Jr. also said that his father had "ripped off drug dealers." The officer located Perez's vehicle parked behind the Fair Grounds and had it impounded, but no drugs were ever found.

At approximately 10:30 p.m., a woman living adjacent to the Fair Grounds observed a man, possibly holding a gun, in her backyard shed where the hot water heater was located. Police were called, and Officer McCormick and his partner Officer Artie Jackson responded. Officer McCormick proceeded quickly down the back stairs of the apartment. Upon reaching the bottom step, a single shot rang out, striking McCormick in the chest. Officer Jackson immediately called for assistance and numerous officers responded. A canine unit discovered Perez hiding under the house next door. During the apprehension, Perez shot the police dog and was himself shot twice by police.

The state trial court appointed doctors to examine Perez and conducted several lunacy hearings to determine Perez's competency. Dr. Raphael Salcedo and Dr. Sarah Deland initially deemed Perez competent to stand trial, but in

August 1997 Perez was determined to be a danger to himself or others and was transferred to the Feliciana Forensic Facility (FFF). Dr. David Carrington was Perez's treating psychiatrist at FFF. Dr. Carrington testified that Perez was not competent at the time of his admission to FFF. In Dr. Carrington's opinion, Perez had a disorganized thought process and a difficulty communicating that was not uncommon with someone who has a significant degree of mental illness. Dr. Carrington testified that Perez had auditory hallucinations of music and the sound of machinery. He also had delusions, such as the belief that he could communicate with his wife telepathically. Dr. Carrington testified on cross-examination that it was "possible" Perez's confinement prior to his transfer to FFF could have contributed to his condition at the time of the initial examination. Dr. Carrington gave Perez the anti-psychotic medication Haldol and examined him on a weekly basis for the first two months of his stay at FFF. Perez's condition improved somewhat after three weeks of taking Haldol, but he still had disorganized thought processes. Dr. Carrington increased the medication dosage, and Perez was eventually restored to competency. He was transferred back to Orleans Parish for trial in December 1997.

Perez conceded that he shot Officer McCormick but defended on the ground of insanity. Perez's defense included lay testimony from his wife and his son, Salvatore Jr. It also consisted of expert testimony from seven psychiatric experts about his delusions, including Dr. Salcedo and Dr. Deland. All seven experts agreed that Perez suffered from severe mental illness and delusions of paranoia and persecution. All seven experts also agreed that Perez was not malingering or feigning his mental condition. Six of the experts testified that Perez's mental illness prevented him from knowing right from wrong on the night of the shooting. The seventh expert, Dr. Carrington, was not asked about Perez's sanity at the time of the offense. Five of the experts were either court appointed or otherwise employed by the state.

Rosa Perez testified that approximately two weeks before her husband left home, he became very quiet and "edgy" in his behavior. She testified that Perez would often look out the window and whisper as if someone were watching or listening to him. She also implied that the night before he left, Perez had been afraid to go outside. On cross-examination, the state confronted Rosa with a statement she had given to Detective Joseph Catalanotto after the shooting. When the police had asked her whether Perez had any history of psychological problems, Rosa had responded, "No. Not that I know of." The statement also showed, however, that Rosa said Perez had been acting strangely for several days. The state also asked Rosa about a report from psychologist Dr. Carlos Kronberger, wherein Rosa reported that she did not remember Perez acting strangely the day he had left home.

Salvatore Jr. also testified that in the weeks before his father drove to New Orleans, Perez had grown quieter and more suspicious. He further described, as noted above, Perez's odd behavior in trying to evade pursuers. On redirect-examination, he admitted telling Detective Catalanotto that he thought a friend of his step-grandfather's had asked Perez to become involved in drug activities but Perez had declined. He also admitted stating that his father thought he had done something to make the "drug buyers" angry, but that he had also insisted his father was not involved with drugs.

The state did not call any expert witnesses or present any expert medical opinions concerning Perez's mental state. It also did not offer any lay testimony on the issue. Instead, it relied on its cross-examination of Perez's witnesses, and it called Detective Catalanotto as a rebuttal witness to testify about the statements from Rosa and Salvatore Jr. The state's theory throughout the trial was that Perez and his family fooled the medical experts by making up the story that Perez feared someone was trying to kill him.

The jury found Perez guilty and recommended life imprisonment. The trial court sentenced Perez to life imprisonment at hard labor, without the benefit of parole, probation, or suspension of sentence.

On direct appeal, Perez argued, among other things, that the evidence was insufficient for a rational jury to conclude that he failed to prove he was insane. The Louisiana Fourth Circuit Court of Appeal disagreed and affirmed the conviction.[2] The court noted that two of the experts, Dr. Salcedo and Dr. Deland, initially had found Perez to be competent but later changed their opinions.[3] The court also held that all the doctors who had testified that Perez did not know right from wrong based their opinions on information obtained from Perez's wife and son but that Rosa Perez's testimony was inconsistent with her pretrial statements and that Salvatore Jr.'s statements about drug dealers provided a rational explanation for Perez's behavior.[4] The court concluded that all of Perez's actions were "consistent with a man fleeing from rebuffed drug dealers."[5] The court also found that the opinions that Perez had disorganized thinking were rendered in examinations conducted long after the shooting, thereby undermining the opinions that Perez was insane at the time of the offense.[6] The state court held that even assuming Perez was not malingering, the experts' opinions hinged on Perez having delusional beliefs, but the record supported the view that Perez "may very well have been justified in his fears."[7] The Louisiana

---

[2] Perez, 745 So. 2d at 181–85.

[3] Id. at 182.

[4] Id. at 183–84.

[5] Id. at 184.

[6] Id.

[7] Id. at 185.

Supreme Court denied Perez's application for writs.[8]  Perez also unsuccessfully sought state post-conviction relief.

Perez then filed the instant § 2254 petition.  The district court granted the petition, holding that the state court had unreasonably applied federal law concerning sufficiency of the evidence.[9]  The district court held that there was no objective reason for the jury to have disregarded the opinions of the disinterested medical experts because the state failed to impinge the experts' veracity, motives, or qualifications.  The district court held that the record does not support the state court's conclusion that the experts' opinions could be undermined by impugning Perez's wife and son because the doctors testified to relying on many other sources of information, including personal examination, arrest reports, witness testimony, and Perez's behavior and actions at the scene.  Furthermore, all the doctors ruled out that Perez was faking his condition.  The court also observed that, contrary to the state court's finding that Perez's behavior could be explained by flight from drug dealers, there was no evidence that Perez was ever being pursued.  In an amended judgment the district court ordered the state to enter a finding of not guilty by reason of insanity and to conduct proceedings in accordance with LA. CODE CRIM. PROC. art. 654.[10]  We granted the state's motion to stay the district court's judgment pending appeal.

---

[8] State v. Perez, 768 So. 2d 32 (La. 2000).

[9] The district court also held that habeas relief was warranted because the state had improperly withheld a witness's statement in violation of Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963), and Perez's trial counsel had rendered ineffective assistance by failing to object to emotional and prejudicial evidence.  Although the state has also appealed the district court's grant of relief on these grounds, we need not address these issues because we agree with the district court's conclusion that Perez proved he was insane.

[10] Louisiana law requires the trial court to determine at a hearing whether a defendant charged with a felony other than in a capital case and adjudged not guilty by reason of insanity is a danger to others or himself, or whether he can be released on probation.  If the defendant is found to be a danger to others or himself, the court shall order him committed to a state or private mental institution.  LA. CODE CRIM. PROC. art. 654.

## II. Standard of review

When reviewing the grant of habeas relief, this court reviews the district court's factual findings for clear error and conclusions of law de novo.[11] The Antiterrorism and Effective Death Penalty Act of 1996 requires a deferential scheme when reviewing claims in a state prisoner's habeas corpus petition that were adjudicated on the merits in state court.[12] A federal court may not grant a state prisoner's petition unless the state court's determination was "contrary to" or an "unreasonable application of" clearly established federal law as determined by the Supreme Court, or was "based on an unreasonable determination of the facts in light of the evidence" presented to the state court.[13] A decision is contrary to clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts."[14] A state court's decision involves an unreasonable application of clearly established federal law if the state court "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case."[15] An unreasonable application differs from an incorrect application; thus, a federal habeas court may correct what it finds to be an incorrect application of law only if the application also is objectively

---

[11] Ramirez v. Dretke, 396 F.3d 646, 649 (5th Cir. 2005).

[12] See 28 U.S.C. § 2254(d); Hill v. Johnson, 210 F.3d 481, 484–85 (5th Cir. 2000).

[13] § 2254(d); see Santellan v. Cockrell, 271 F.3d 190, 192 (5th Cir. 2001).

[14] Williams v. Taylor, 529 U.S. 362, 412–13, 120 S. Ct. 1495, 1523 (2000).

[15] Id. at 407–08, 120 S. Ct. at 1520.

unreasonable.[16]  A state court's factual determination is presumed to be correct and can be rebutted only by a showing of clear and convincing evidence.[17]

## III.  Discussion

The state challenges the district court's conclusion that the evidence was insufficient for the jury to find that Perez failed to show he was insane.  In a federal habeas corpus proceeding, the Supreme Court's decision in Jackson v. Virginia provides the standard for testing the sufficiency of the evidence.[18]  The question "is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[19] This standard is applied with "reference to the substantive elements of the criminal offense as defined by state law."[20]

In Louisiana, a criminal defendant is presumed to be sane and responsible for his actions.[21]  The defendant may rebut this presumption based on a preponderance of the evidence.[22]  "Legal insanity is proved if the circumstances indicate that a mental disease or mental defect rendered the offender incapable of distinguishing between right and wrong with reference to the conduct in question."[23] In light of Louisiana law on the issue of insanity, the question under the Jackson sufficiency standard is whether, viewing the evidence in the light

---

[16] See id. at 409–11, 120 S. Ct. at 1521–22.

[17] 28 U.S.C. § 2254(e)(1).

[18] 443 U.S. 307, 99 S. Ct. 2781 (1979).

[19] Id. at 319, 99 S. Ct. at 2789.

[20] Id. at 324 n.16, 99 S. Ct. at 2792 n.16.

[21] LA. REV. STAT. § 15:432; State v. Peters, 643 So. 2d 1222, 1225 (La. 1994).

[22] LA. REV. STAT. § 15:652; see State v. Silman, 663 So. 2d 27, 32 (La. 1995).

[23] Peters, 643 So.2d at 1225 (citing LA. REV. STAT. § 14:14).

most favorable to the state, any rational trier of fact could have found beyond a reasonable doubt that Perez did not prove by a preponderance of the evidence that he was insane at the time of the offense.[24]

The state appellate court invoked the Jackson standard in Perez's direct appeal.[25] Therefore, because the state court identified the correct legal standard, we must determine whether that court's application of that standard was objectively unreasonable.[26]

The state was not required to present expert evidence to contradict Perez and establish that he was sane. Lay testimony alone may be used to successfully rebut an expert's opinion.[27] We have recognized with respect to insanity, however, that "the opinions of experts may not be arbitrarily ignored" and that "some reason must be objectively present for ignoring expert opinion testimony."[28] Expert evidence may be rebutted "by showing the incorrectness or inadequacy of the factual assumptions on which the opinion is based, 'the reasoning by which he progresses from his material to his conclusion,' the interest or bias of the expert, inconsistencies or contradictions in his testimony as to material matters, material variations between the experts themselves, and defendant's lack of co-operation with the expert."[29]

Even though the state did not present any direct evidence of Perez's mental condition, the state appellate court concluded that the evidence was

---

[24] See id.; see also Donahue v. Cain, 231 F.3d 1000, 1004 (5th Cir. 2000).

[25] Perez, 745 So. 2d at 181.

[26] See Williams, 529 U.S. at 413, 120 S. Ct. at 1523.

[27] See Peters, 643 So. 2d at 1226; Brock v. United States, 387 F.2d 254, 257 (5th Cir. 1967).

[28] Brock, 387 F.2d at 257.

[29] Mims v. United States, 375 F.2d 135, 143–44 (5th Cir. 1967) (footnotes and citations omitted).

sufficient for the jury to find Perez did not show he was insane for essentially three reasons: first, that there was a substantial delay, ranging from nine to seventeen months, between the shooting and the experts' examinations of Perez; second, that the experts based their opinions on information provided by Rosa Perez and Salvatore Perez, Jr., whose information about Perez's history was inconsistent with pretrial statements and therefore unreliable; and third, that all of Perez's behavior was consistent with and could be explained by his fear of rebuffed drug dealers. The state also advances these reasons in its appellate brief for reversing the district court's grant of habeas relief. All of the factors considered in the state court's decision purport to undermine the bases for the opinions of the psychiatric experts who testified at trial that Perez was insane.

At the outset, we note that all of the experts who testified at trial that Perez was insane at the time of the offense were consistent in their opinions that Perez suffered from a severe mental illness.[30] All of the experts were well-qualified, as the state stipulated at trial. Most of the experts were also disinterested due to their capacities as court appointees or employees of the state.[31] The state appellate court, however, failed to include the experts' qualifications and disinterested status in its calculus of what a rational jury could have found when considering the expert opinions.[32]

---

[30] The diagnoses included "chronic paranoid schizophrenic" (Dr. Kenneth Ritter); "atypical psychosis . . . delusional disorder" (Dr. Raphael Salcedo); "psychosis not otherwise specified" with "prominent symptoms of paranoia and persecution" (Dr. Jose Pena); "delusional disorder, persecutory type" (Dr. Guillermo Urrutia); "psychotic disorder similar to schizophrenia" (Dr. Sarah Deland); and "delusional disorder, persecutory type, severe" (Dr. Carlos Kronberger).

[31] Dr. Ritter, Dr. Salcedo, and Dr. Deland were all appointed by the court to the sanity commission. Dr. Carrington was employed by the state as a staff member at FFF. Dr. Pena examined Perez at the request of the FFF staff.

[32] See Brock, 387 F.2d at 258 (holding that single lay witness's testimony was insufficient to rebut "the opinion of a skilled and disinterested government psychiatrist, which opinion is in no way impugned or discredited").

With respect to the delay in the experts' examinations of Perez, the state appellate court found that the experts' opinions about Perez's status at the time of the offense were undermined for essentially two reasons. First, the court noted that a Charity Hospital record from the night of the shooting reported that when Perez was brought to the hospital he was "oriented, responsive, and obeying commands."[33] Second, Dr. Carrington "admitted that Perez's condition at the time he first examined him at the FFF in August 1997 could have been attributed in some part to his thirteen months of incarceration in Orleans Parish prison."[34] The state court apparently reasoned that a rational jury could have found that these facts together gave a more accurate picture of Perez's mental state at the time of the offense than the experts' subsequent examinations. We disagree.

The Charity Hospital notation cannot be considered in a vacuum. Dr. Carrington, the only expert who was asked about the record, explained that "oriented" meant that Perez knew who he was, where he was, and generally what time it was. He testified that "responsive" meant that Perez was "essentially . . . not unconscious." Furthermore, Dr. Urrutia testified that when he examined Perez and formulated his opinion, he considered the Charity Hospital records. Therefore, Dr. Urrutia was aware of Perez's reported state at the time he was admitted to the hospital with two gunshot wounds, and he still concluded that Perez was insane at the time of the offense. Significantly, none of the doctors were asked whether the Charity Hospital notation changed their opinion.

Dr. Carrington did testify that it was "possible" Perez's pretrial incarceration could have contributed to the condition in which he found Perez in

---

[33] Perez, 745 So. 2d at 184.

[34] Id.

August 1997. However, Dr. Carrington was not asked whether the incarceration was the sole cause of Perez's condition or even the degree to which Perez may have been affected, and he was not asked whether Perez was sane at the time of the offense. The jury was given nothing from which it could draw an inference about Perez's mental state on the night of the offense from Perez's pretrial incarceration "possibly" contributing to his state in August 1997. There was simply no rational basis for a jury to infer that Perez was sane at the time of the shooting and became insane due only to his living conditions after apprehension.

The state appellate court also apparently concluded that the delay between the shooting and the experts' examinations significantly undermined the expert opinion because two of the experts, Dr. Salcedo and Dr. Deland, both initially found Perez to be competent to stand trial and later changed their opinions. The state trial court appointed both doctors to the sanity commission to determine Perez's competency. Both explained that they initially found Perez competent because he was vague during questioning and provided minimal answers, such as "I don't know" or "I don't remember." The doctors revised their opinions when they received more information and as Perez became more communicative. Dr. Salcedo recognized his earlier opinion and testified that he thought Perez may have been malingering. Dr. Salcedo could not conclusively rule out a delusional disorder, however. In an abundance of caution, he and Dr. Deland recommended that Perez be placed at FFF, where the issue of malingering could be better assessed because Perez would be under 24-hour observation. As noted above, Perez was ultimately placed on anti-psychotic medication at FFF. Dr. Deland further explained that the circumstances of her first interview with Perez, conducted in the presence of several others, including attorneys and a court reporter, presented an intimidating environment that could explain Perez's initial reticence. She also testified that it is not unusual for a paranoid individual to initially present as competent.

We agree with the district court that although the two doctors' opinions changed, the change did not undermine their ultimate unequivocal opinion that Perez was insane and was not malingering. We also agree that in the absence of contrary evidence, or inconsistencies in the reports of the other experts, the revisions by Dr. Salcedo and Dr. Deland were not sufficiently material to provide the jury with a rational basis to disregard the testimony of all seven mental health experts.

We further agree with the district court's conclusion that impugning the veracity of Perez's wife and son was insufficient to permit the jury to ignore the experts' opinion and conclude that Perez was sane. Although the doctors did receive important information from Rosa Perez and Salvatore Jr., they did not rely solely on that information when formulating their opinions. They also considered information from personal examinations of Perez, test results, arrest reports, and witness testimony. Significantly, Dr. Kronberger testified that his conclusion was based on Perez's behavior during five or six examinations, spanning 14 hours, and that information provided by Perez's family "just added a little bit of flavor." Dr. Deland testified that Perez exhibited classic signs of a delusional belief system during examination. Dr. Ritter testified that he also obtained information from Perez and from the FFF records. Dr. Ritter also testified that he saw a report of Perez's encounter with the Fair Grounds security guard on the morning of the shooting. Dr. Ritter opined that Perez's action in grabbing his son in a protective manner and his belief that the security guard might kidnap his son were typical of Perez's delusional belief system. As noted above, Dr. Urrutia examined the Charity Hospital records. Dr. Salcedo examined the arrest report and testimony at preliminary hearings. Dr. Pena testified that all available information goes into forming an opinion. It is clear that the doctors considered a wide array of information apart from interviews with Perez's wife and son when forming their opinions. As the district court

found, given that the experts' credentials and interests were untainted, their opinions could not be undermined simply by attacking the stories of Perez's wife and son.

Both Dr. Pena and Dr. Urrutia testified that Perez's improvement with medication and treatment at FFF also demonstrated his illness. A defendant's responsiveness to medication and therapy is an accepted indicator of insanity.[35] Perez's condition improved once he began taking the anti-psychotic drug Haldol, and in fact his disorganized thinking did not sufficiently improve to render Perez competent until Dr. Carrington increased the dosage of medication. The medical experts ruled out that Perez was fabricating his condition in part because a layman would not know what response would be expected from the drugs. The doctors' testimony indicates that a psychotic person does not become competent with medication immediately because the process takes time. Perez exhibited continual signs of delusional behavior, even though he was under 24-hour observation at FFF, and then showed the classic response to the medication. The state introduced no evidence to suggest that Perez's response was not genuine.

The state appellate court also reasoned that a rational jury could conclude Perez was sane because his actions were consistent with a person fleeing from rebuffed drug dealers.[36] The state court reasoned that because information about friends of Perez's step-grandfather being involved with drugs and about Perez spurning those people came from Perez's wife and son, they were not delusions. The state appellate court concluded that the medical experts' opinions were undermined because the opinions were based on Perez having delusions of persecution, but "the record supports the view that [Perez] may very

---

[35] Peters, 643 So. 2d at 1226; State v. Roy, 395 So. 2d 664, 668 (La. 1981).

[36] Perez, 745 So. 2d at 184.

well have been justified in his fears."[37] For example, the state appellate court discounted Dr. Ritter's opinion that Perez had been pushing buttons in the van for some "magical reason" because Perez was "obviously attempting to out-wit any pursuers, perhaps making them think that he saw them."[38]

We disagree that the record shows Perez may have been justified in his fears. As the district court held, there was no evidence that there actually were drug dealers in pursuit of Perez. Salvatore Jr. testified that he told police they were being followed by gangs from Texas because his father told him that. He did admit telling police his father thought his step-grandfather's friends sold drugs, but he also told police that his father was not involved with narcotics. Detective Catalanotto confirmed this statement. The record simply provides no basis for a rational jury to conclude that Perez was being chased by drug dealers from Texas, and Perez's behavior may not be so neatly explained away.[39]

Furthermore, we agree with the district court that the medical experts personally observed psychotic behavior in Perez independently of whether anyone was pursuing him. For example, Dr. Carrington found that Perez had disorganized thought processes, characterized by difficulty communicating in a coherent manner, and had experienced hallucinations of music and the sound of machinery. Dr. Ritter testified that Perez's action when confronted by the Fair

---

[37] Id. at 185.

[38] Id. at 184.

[39] The state appellate court also speculated that Perez, already on the run from drug dealers, could have shot the police officer because he did not want to go to jail after his encounter with the Fair Grounds security guard. Perez, 745 So. 2d at 184. The court noted that Dr. Pena testified he could imagine such a scenario. There are several problems with this speculation. First, the lack of evidence of drug dealers undermines the court's hypothesis. Second, Dr. Ritter's testimony showed that Perez's encounter with the security guard was consistent with his delusions. And finally, the state asked Dr. Pena a hypothetical question assuming that Perez had a rational reason for acting as he did, and Dr. Pena responded equivocally that he "guess[ed] that could be imagined." Dr. Pena's answer, without more, was insufficient for a rational jury to ignore Perez's evidence of insanity.

Grounds security guard, who could hardly be mistaken for a drug dealer while clad in uniform, was consistent with the delusions of persecution. Dr. Deland described Perez as presenting "a very classic case" of someone with a delusional belief of being persecuted and threatened. She specifically observed Perez's demeanor during her assessment and noted that people cannot generally manufacture such symptoms while under 24-hour observation, as Perez was at FFF.

The state appellate court's speculative conclusion is also objectively unreasonable. It is objectively unreasonable to conclude that a rational family man with no violent criminal history would suddenly flee with one son, leave his remaining family behind, drive to an unfamiliar city in an unfamiliar state, hide in someone's backyard shed, and then shoot a police officer.

We are mindful that a state prisoner's burden is especially heavy on habeas review of the sufficiency of the evidence. The jury's finding of facts will be overturned only when necessary to preserve the "fundamental protection of due process of law."[40] We agree with the district court, however, that such protection is warranted in this case.

The evidence that Perez produced as to his insanity was overwhelming. It included lay testimony from Perez's wife and son describing a slow progression of odd behavior, which the experts found consistent with classic symptoms of mental illness; lay testimony from his son about bizarre behavior on the drive to New Orleans; consistent expert testimony from largely disinterested doctors that Perez is mentally ill, suffers from delusional behavior, and did not know right from wrong on the night of the offense; expert opinion that it was very unlikely Perez and his family would know how to fake the illness; and objective evidence that once he was given anti-psychotic medication, Perez's condition

---

[40] Jackson, 443 U.S. at 319, 99 S. Ct. at 2789.

improved in a manner that a layman would not know how to fabricate. The state produced insufficient evidence solely through cross-examination and argument to controvert Perez's claim. We therefore conclude that Perez established by a preponderance of the evidence that he was insane and that the state appellate court's conclusion that a rational jury could have found otherwise was an objectively unreasonable application of federal law.

The judgment is AFFIRMED. As ordered, the State of Louisiana is to conduct proceedings in accord with LA. CODE CRIM. PROC. art. 654.